993 So.2d 837 (2008)
Paul M. NEESE, Appellant
v.
STATE of Mississippi, Appellee.
No. 2007-KA-01070-COA.
Court of Appeals of Mississippi.
October 14, 2008.
*840 Edmund J. Phillips, Newton, attorney for appellant.
Office of the Attorney General by Billy L. Gore, attorney for appellee.
EN BANC.
IRVING, J., for the Court.
¶ 1. Paul M. Neese was convicted in the Neshoba County Circuit Court of two counts of murder and was sentenced to two life terms in the custody of the Mississippi Department of Corrections. Aggrieved, he appeals and asserts (1) that the trial court erred in refusing to conduct an evidentiary hearing to determine the voluntariness of his confession, (2) that the trial court erred in denying his request for a peremptory instruction and his motion for a new trial or, alternatively, motion for a judgment notwithstanding the verdict, and (3) that the trial court erred in refusing to grant his request for a manslaughter instruction.
¶ 2. We find no error; therefore, we affirm Neese's convictions and sentences.

FACTS
¶ 3. Around 11:00 a.m. on November 6, 2006, Neese went to a trailer that was occupied by a person he knew as Buckwheat to retrieve his vehicle that he had loaned him some two to three weeks earlier.[1] Neese had purchased drugs at this trailer on prior occasions. Neese remained at the trailer from around 11:00 a.m. on November 6 until around 6:00 a.m. on November 7. While at the trailer during the early morning hours of November 7, Neese killed two teenagers, Jamal Peebles and Lakendrick Boyd, by shooting them each once in the head. At trial, Neese testified on his own behalf and admitted shooting both Boyd and Peebles, but *841 claimed he did so in self-defense.[2]
¶ 4. According to Neese, when he arrived at the trailer, Buckwheat was not there, and as he was about to leave, he was flagged down by Boyd and Peebles. They told him that Buckwheat had left but that he was expected to return. Neese decided to sit in his vehicle, which was parked in the driveway, and wait for Buckwheat to arrive. Neese testified that while he was waiting, he was approached by an unidentified person who told him that Boyd and Peebles, not Buckwheat, had his car. After waiting for a couple of hours, Boyd and Peebles told Neese that he could not wait in the vehicle any longer and invited him to come in.
¶ 5. When Neese entered the trailer, another person was present whom he knew as "the tall guy." Neese purchased cocaine from the tall guy, and then the tall guy asked to borrow Neese's car. Neese agreed, and after the tall guy left, Neese smoked the cocaine.[3] Neese stated that during the time that he was at the trailer, people constantly flowed in and out. After night fell, Neese figured that Buckwheat was not going to return, so he decided to leave. At that point, Peebles asked Neese for the money that he owed them.[4] Neese responded by telling him that they would get their money when he got his car back. Neese testified that when he turned to leave, Boyd and Peebles started hitting, punching, kicking, and pistol-whipping him. Neese stated that he could not defend himself physically because he does not have full function of his right arm and lower left leg. He further testified that Boyd and Peebles took his wallet, which was empty, so he gave them money from his pocket and again tried to leave but was prevented from doing so. Neese was unable to give a specific time as to when these events occurred, but he knew that they occurred sometime after dark on the night of November 6. In any event, as previously stated, sometime around 6:00 a.m. the next day, Neese killed Boyd and Peebles. After he killed them, he took money that he claims was on the floor, went to a nearby house, and asked the occupants to call the police.
¶ 6. Sergeant John Holland of the Philadelphia Police Department responded to the 911 call and was approached by Neese as he exited his patrol car. Sergeant Holland testified that he asked Neese what was going on, and Neese responded by saying, "if I take my jacket off, you're going to arrest me. I just shot two people and the gun is in my back pocket." Sergeant Holland then conducted a pat down of Neese and retrieved a .38 caliber handgun from his left back pocket. Neese was arrested and thereafter gave a written statement.
¶ 7. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Evidentiary Hearing
¶ 8. Neese contends that the trial court erred in failing to hold an evidentiary hearing to determine the voluntariness of his confession to Sergeant Holland. *842 "The threshold question in a Miranda[5] rights analysis is whether the defendant was in custody and being interrogated when the statement in question was made. Neither general on the scene questioning, nor voluntary statements made by a defendant are enough to trigger the requirements of Miranda." Drake v. State, 800 So.2d 508, 513(¶ 12) (Miss.2001) (quoting Miller v. State, 740 So.2d 858, 867(¶ 35) (Miss.1999)). The following factors should be considered when determining whether a reasonable person would feel as if he was in custody: "(a) the place of interrogation; (b) the time of interrogation; (c) the people present; (d) the amount of force or physical restraint used by the officers; (e) the length and form of the questions; (f) whether the defendant comes to the authorities voluntarily; and (g) what the defendant is told about the situation." Id. (quoting Hunt v. State, 687 So.2d 1154, 1160 (Miss.1996)). The determination of whether a person is in custody is based on the totality of the circumstances. Id.
¶ 9. It is clear to us from our review of the record that Neese's admission occurred before he was taken into custody. As previously stated, Neese approached Sergeant Holland and admitted shooting Boyd and Peebles when Sergeant Holland inquired as to what was going on. The admission occurred around 6:00 a.m. on November 7 near the residence where Neese had gone to call 911. Neese and Sergeant Holland were the only people present when Neese made his admission. No force was used, and Neese was not physically restrained when the admission was made. Based on our analysis, we conclude that Neese could not have believed that he was in custody and unable to leave when he made the admission to Sergeant Holland. Additionally, the record does not support a finding that Sergeant Holland's inquiry was made in an attempt to elicit incriminating information from Neese. Therefore, Sergeant Holland was not required to read Neese his Miranda warnings, and there was no need for the trial judge to hold a hearing on the admissibility of Neese's statement because it is clear that Neese's statement was made prior to his arrest and a part of Sergeant Holland's efforts to gather information generally about what had transpired. This issue is without merit.

2. Sufficiency and Weight of the Evidence
¶ 10. In his second assignment of error, Neese argues that the trial court erred in denying his request for a peremptory instruction and his motion for a new trial or, alternatively, a motion for a judgment notwithstanding the verdict. Thus, Neese challenges both the sufficiency and the weight of the evidence supporting his conviction. A motion for a judgment notwithstanding the verdict and a request for a peremptory instruction challenge the sufficiency of the evidence supporting a conviction. McClain v. State, 625 So.2d 774, 778 (Miss.1993). By contrast, "[a] motion for [a] new trial challenges the weight of the evidence." Ivy v. State, 949 So.2d 748, 753(¶ 21) (Miss.2007) (citing Sheffield v. State, 749 So.2d 123, 127(¶ 16) (Miss.1999)). We separately address Neese's arguments concerning the sufficiency and the weight of the evidence.

a. Sufficiency
¶ 11. When presented with a claim that the evidence is insufficient to sustain a conviction, we review the record *843 in "a light most favorable to the State." Robinson v. State, 940 So.2d 235, 239-40(¶ 13) (Miss.2006) (citing McClain, 625 So.2d at 778). This Court "must accept as true all evidence consistent with [the defendant's] guilt, together with all favorable inferences that may be reasonably drawn from the evidence, and disregard the evidence favorable to the defendant." Id. at 240(¶ 13). If the evidence is "of such quality and weight that, `having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [persons] in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss. 2005) (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). Keeping this standard in focus, we now turn to the facts of this case.
¶ 12. Neese relies on Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933) to support his contention that as the only eyewitness to the shootings, his testimony established a case of self-defense that was not substantially contradicted by other evidence. Neese argues that the trial court erred in failing to grant his peremptory instruction for each count. Neese claims that his peremptory instructions were his way of bringing forth his Weathersby argument. We note at the outset that Neese does not mention the Weathersby rule in his posttrial motion. It is well established that "questions will not be decided upon appeal which were not presented to the trial court and that court given an opportunity to rule on them...." Fleming v. State, 604 So.2d 280, 293 (Miss. 1992) (quoting Colburn v. State, 431 So.2d 1111, 1113-14 (Miss.1983)). Thus, this issue is procedurally barred for failure to present it to the trial court. Procedural bar notwithstanding, we find no merit to this issue, as Weathersby is inapplicable to the facts of this case.
¶ 13. In Weathersby, the Mississippi Supreme Court held that:
where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
Weathersby, 165 Miss. at 209, 147 So. at 482 (emphasis added) (citing Houston v. State, 117 Miss. 311, 315, 78 So. 182, 183 (1918)). We find Weathersby inapplicable because Neese's version of events is unreasonable and is contradicted by credible witnesses for the State and by the physical facts. The State offered the testimony of four credible witnesses whose testimony, in our view, contradicts Neese's version of what happened. We begin our discussion with Neese's version of the events.
¶ 14. On direct examination, Neese stated that Boyd and Peebles began shooting dice and smoking marijuana. He recalled that Peebles was lying on a couch and that Boyd was lying across a mattress that was on the floor. Neese stated that Peebles had a pearl-handled revolver and that Boyd had a black handgun. Neese testified that a rifle was lying in front of the couch.[6] According to Neese, Boyd and Peebles gambled and smoked marijuana for a while before "cooling out." Neese testified that Peebles then placed the pearl-handled gun on his chest and that *844 Peebles and Boyd held a conversation until Boyd's cellular telephone rang. Neese stated that Boyd rolled over to his left side and retrieved the telephone but that he did not answer it. Instead, he began pushing buttons. Neese testified that he noticed the butt of the gun sticking out from under Boyd after Boyd rolled over to get the cellular telephone that was lying on the mattress to Boyd's left. When Boyd rolled over to retrieve the telephone, Neese reached and grabbed, in one motion, the gun that was sticking out from under Boyd. As he did so, he stumbled and fell on the floor in front of a chair that he had been sitting in. At that point, according to Neese, Boyd looked over Boyd's shoulder and saw that Neese had the gun, so Boyd rolled on over "and reached for the couch." At that point, Neese shot Boyd. According to Neese, after he shot Boyd, Peebles looked across Peebles's shoulder and saw him. At that point, Peebles started digging beside the couch for the gun that Neese claims had apparently fallen off of Peebles's chest. Neese then shot Peebles.
¶ 15. Neese testified that after he shot Boyd and Peebles, he heard the tall guy pull up outside, so he covered their heads with a bedspread to prevent the tall guy from immediately noticing that they had been shot. However, the tall guy did not come inside the trailer.
¶ 16. On cross-examination, Neese testified that after he grabbed the gun, Boyd rolled over toward Peebles on the couch. According to Neese, Boyd then "dove for the front of the couch with his other hand." Neese continued his testimony as reflected in the following exchange between him and the prosecutor:
Q. You thought he was going for the other fellow's gun?
A. I was certain he was. Yes, sir. No, he  I thought he was going for the rifle, honestly.
Q. But anyway, that's when you shot him?
A. Yes, sir.
Q. Now, tell me where you were standing.
A. I wasn't standing. I was laying [sic] down by that time across the front of the couch  uh  chair. I had  when I come [sic] off the mattress I stumbled and I fell across the front of the chair.
(Emphasis added).
Q. Okay. But where were you when you shot him? Or shot the first guy?
A. Laid [sic] across the front of the chair.

* * * *
Q. When you shot the first fellow, how many guns could you see that they had?
A. There was [sic] two there where they could get their hands on. I mean, one of them had  as far as I know, he had his hand in it.
Q. One of them was under the couch and it was a rifle?
A. Yes, sir.
Q. You didn't give him a chance to get it out?
A. He was going for it.
Q. And the other white handled pistol was on the other fellow's chest?
A. The last  the last I had seen it, you know.
Q. Well, could you see it when you shot him?
A. No. He was  he had done [sic] turned and looked over his shoulder at me so I  like I said, I couldn't see nothing but  I done [sic] fell across the front of the chair. All I could see was his head looking at *845 me. And he looked back, kindly [sic], and started digging for  digging beside of him.
¶ 17. During further cross-examination, Neese was asked how the gun that he had previously stated was on Peebles's chest got under the cushions of the couch. Neese answered in the following exchange:
Q. All right. The one on the couch, did he have a gun too?
A. Yes, sir. He had a couch  he had a gun sitting on his chest.
Q. Sitting on his chest?
A. Yes, sir.
Q. How did it get under the couch  under the cushion of that couch then?
A. Uh  best I can tell you is, when I pulled that  uh  bedspread out from under him, it must have fallen off. I don't know. I can't tell you that. I  I have no idea.
Q. Pulled the bedspread out from under him?
A. Yeah. He was laying [sic] on top of the bedspread and when I pulled it and covered him up, I pulled it out from under him.
Q. And covered him up with it?
A. Yes, sir.
Q. And  but you don't  can't explain for sure how that pistol got under the cushion of the couch?
A. No sir. It was on his chest the last time I had seen it.
Q. When was the last time you seen [sic] it?
A. Right before I  I ended up getting in a confrontation with the one on the mattress.
Q. At the time of the shooting?
A. Yes, sir.
Q. It was on his chest, is what you're saying?
A. Yes, sir. Yes. Right when I shot. And then when he  I guess, when he turned over and looked up at me it come off his chest or something, because he went digging for it.
¶ 18. Neese's statement, given to the police the day following the shooting, differed substantially from his trial testimony. In his statement, Neese wrote:
One was laying [sic] across the bed and the other one was on the couch while they were smoking the blunts. I was steadily trying to get out of there without getting shot. They got pretty still. One person came up and they told them they were out of dope. They were lying one on the mattress and one on the couch. The guy on the mattress rolled over a little bit and I saw the handle of the gun sticking out and [I] knew he didn't have it in his hand. I knew he wasn't completely asleep because his phone was ringing and he answered it. I could tell he was drowsy. I studied it for a while and finally reached in one motion and got the gun. He was starting to come up and I was scared to death. I had to shoot that one. The other guy was coming up trying to get to me. I knew he had a gun from his hitting me earlier with it. I shot him before he got up to me. He was trying to raise up but I didn't give him a chance to get me.
¶ 19. We now turn to a discussion of the State's evidence. As stated, the State offered the testimony of four witnesses.
¶ 20. First, the State offered the testimony of Sergeant Holland who was the first officer on the scene. Sergeant Holland viewed Boyd's and Peebles's bodies at the scene and concluded, based on the position of the bodies, that Boyd and Peebles were sleeping at the time they were shot. Sergeant Holland testified that *846 when he and the other officers arrived at the scene, they attempted to awake Boyd and Peebles because it appeared to them that Boyd and Peebles were asleep. In the process of attempting to awake them, Officer Danny Carter, also with the Philadelphia Police Department, moved a blanket that was covering Boyd, and they noticed a large amount of blood around Boyd's head area.
¶ 21. Second, the State offered the testimony of Jimmy Reid, chief investigator for the Philadelphia Police Department. According to Chief Investigator Reid, when he arrived at the scene, he found Peebles lying on the couch and Boyd on a mattress next to the couch. Chief Investigator Reid testified that both appeared to be dead and that they also appeared to have been sleeping prior to being killed. Chief Investigator Reid further testified as follows:
The  the gentleman on the couch, Mr. Peebles, was lying with his head on a pillow, with his arm like he was propped up against the edge of the couch. Both feet were on the other arm rest of the couch, facing  facing west. Mr. Peebles  uh  Mr. Boyd was lying across the  the  mattress with his whole body and his feet were generally facing the other corner, the opposite corner, and I believe his feet were crossed as if he were asleep.
Finally, Chief Investigator Reid testified that once they removed Peebles's body, they pulled the couch cushions back and found a .22 caliber pearl-handled pistol lying under the cushions.
¶ 22. Third, the State offered the testimony of Dr. Steven Hayne. Dr. Hayne performed an autopsy on the bodies of Peebles and Boyd. According to Dr. Hayne, the muzzle of the weapon that fired the projectile into Peebles's head was approximately six inches from Peebles's head at the time that the projectile was discharged. Dr. Hayne explained:
The projectile went through the scalp producing a wound measuring again, approximately one-quarter of an inch.... There was tattooing, or unburnt powder, that was buried immediately underneath the skin approximately two and a half inches by three inches. That would indicate that the weapon was in close proximity to the entrance gunshot wound, within inches of the entrance gunshot wound when the weapon was fired.

* * * *
Tattooing is unburnt powder that leaves the muzzle of the weapon when the  uh  weapon is fired, and it will come down the barrel when the weapon is fired, leave and start producing a cone shaped dispersion on the  uh  tattooing material as unburnt powder. The closer you are, the smaller the circular tattooing on the skin surface. As it leaves the barrel it starts spreading and you get a wider and wider and wider pattern of unburnt powder embedded immediately underneath the skin's surface since you're producing a coned effect. And you can  and again, an approximation of the distance from the entrance gunshot wound to the muzzle by looking at the size of the dispersion of the  uh  tattooing. In this case, without testifying to weapon [sic], I would estimate that it is [sic] inches away from the decedent's heard when fired. Approximately six inches. Could be even slightly greater than that, but it's not going to be much greater than that, and it's going to be in relatively close proximity to the entrance gunshot wound when that weapon was discharged.

(Emphasis added).
¶ 23. Fourth, the State offered the testimony of Officer Carter. Officer Carter, *847 corroborated the testimonies of Sergeant Holland and Chief Investigator Reid regarding the sleeping appearance of the bodies when the officers arrived on the scene. He added that the photographs that were taken were a true and accurate depiction of the bodies as they found them.
¶ 24. Additionally, the State offered into evidence photographs of the bodies of Boyd and Peebles, which corroborate the testimony of Sergeant Holland, Chief Investigator Reid, and Officer Carter regarding the posture and appearance of the bodies as they were found when they arrived at the scene. The crime scene photographs belie Neese's version of events and make clear to us that he shot Boyd and Peebles while they slept. One photograph depicts Boyd lying on a mattress, on his back, with his legs crossed at the ankles, and his left arm bent back with his hand resting on his left shoulder. A photograph of Peebles shows him lying on the couch on his back with one of his arms resting on his stomach, and the other bent at the elbow with his face resting on his hand. There is no gun lying on Peebles's chest in this photograph. Another photograph taken after the law enforcement officers pulled back the cushions of the couch shows a pearl-handled pistol tucked underneath the cushion of the couch by the springs.
¶ 25. The positions of Peebles's and Boyd's arms and feet in the photographs emphatically and unequivocally contradict Neese's claim (1) that Peebles was digging for a gun when Neese shot him, and (2) that Boyd dove for the front of the couch with one of his hands. While a photograph depicts one of Boyd's arms outstretched toward the couch, the photograph also shows Boyd lying on his back and not in a diving position. There is no evidence that either body had been repositioned before law enforcement officials arrived. This Court considers it highly improbable that Boyd would have had his legs crossed and at the same time would have been able to dive for a gun that was on the floor underneath the nearby couch. Likewise, it is even more improbable that Peebles could have been digging for a gun while lying on his back with one of his arms resting on his stomach and the other bent at the elbow with his face resting on his hand. Further, Dr. Hayne's testimony directly and forcefully contradicts Neese's claim that he was a few feet away crouched over a chair or in front of a chair when he shot Peebles. Based on Dr. Hayne's testimony, there is but one conclusion to draw regarding Peebles's killing: Neese shot him execution-style, with the barrel of the gun only a few inches away from Peebles's head when the trigger was pulled.
¶ 26. "The Weathersby rule is also inapplicable where the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." Green v. State, 631 So.2d 167, 174 (Miss.1994) (citing Blanks v. State, 547 So.2d 29, 34 (Miss. 1989)). Neese's written statement on November 8, 2006, differed substantially from his trial testimony. In his statement, Neese stated that he shot Boyd after Boyd started to "come up." At trial, Neese testified that when he shot Boyd, Boyd was reaching for a gun. He also testified at trial that when he shot Peebles, Peebles was digging for a gun that had apparently fallen off of Peebles's chest. In his statement, Neese did not mention that a gun fell from Peebles's chest and that Peebles was digging for it when he shot him. He simply stated that "I shot him before he got up to me. He was trying to raise up but I didn't give him a chance to get me." Neese also said in his statement, but not at trial, that when he heard a car pull up, he placed a shoe over blood that was on the *848 floor. As already noted, Neese's trial testimony was that when he heard the car pull up, he covered Boyd's and Peebles's heads with a bedspread to prevent them from appearing to have been shot.
¶ 27. In summary, we find that Neese's reliance on Weathersby is misplaced for the following reasons: (1) Neese's version is not reasonable and is substantially and materially contradicted by credible witnesses for the State and by the physical facts or by facts of common knowledge, and (2) Neese's statement following the killings is inconsistent with his version of events as recounted at trial. This issue lacks merit.

b. Weight
¶ 28. An appellate court "will reverse a trial judge's denial of a request for [a] new trial only when such denial amounts to [an] abuse of that judge's discretion." Coleman v. State, 697 So.2d 777, 788 (Miss.1997) (quoting Shields v. Easterling, 676 So.2d 293, 298 (Miss.1996)). "[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush, 895 So.2d at 844(¶ 18) (citing Herring v. State, 691 So.2d 948, 957 (Miss. 1997)). When determining whether a motion for a new trial should have been granted, "[t]he motion ... is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." Id. (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947(¶ 18) (Miss.2000)). "However, the evidence should be weighed in the light most favorable to the verdict." Id. (citing Herring, 691 So.2d at 957).
¶ 29. Viewing the evidence in the light most favorable to the State, we conclude that the trial judge did not err in refusing to grant Neese's request for a new trial, as this is not a case where "the evidence preponderates heavily against the verdict." The jury reached its verdict based on the evidence presented at trial, and it was entitled to disbelieve Neese's version of events. Allowing the verdict to stand will not sanction an unconscionable injustice. There is no merit to this issue.

3. Manslaughter Instructions
¶ 30. In his final assignment of error, Neese argues that the trial judge improperly denied his requests for manslaughter instructions. Neese's reference to instructions is not entirely clear. The record reflects that Neese offered only one instruction.[7] When this instruction was offered, the State objected, and the following exchange occurred:

INSTRUCTION NO. 12: BY THE COURT: Twelve?
BY [PROSECUTOR]: Objection.
BY THE COURT: What's your objection?
BY [PROSECUTOR]: Not entitled to a manslaughter instruction.
BY THE COURT: I didn't grant or refuse that when I read it the first time. Where's your evidence of manslaughter, [Defense Attorney]?

*849 BY [DEFENSE ATTORNEY]: Judge, I just think that the issue of self-defense is certainly out there. Now, it  it's entirely possible that the jury could say well, he was entitled to exhibit some force, but he used unreasonable force, and I think it's the law in the [S]tate of Mississippi that if you use unreasonable force but are entitled to exhibit some force, then that's manslaughter.
BY THE COURT: It is. You got the law on that?
BY [DEFENSE ATTORNEY]: No, sir.
BY THE COURT: Well, if  even if I consider giving you the manslaughter instruction, I've got to have a manslaughter instruction. I can't just say he's guilty of manslaughter. I've got to say what manslaughter is.
BY [DEFENSE ATTORNEY]: You're right, Judge.
BY THE COURT: So, where are we?
BY [DEFENSE ATTORNEY]: Judge, if the  if the court would allow D-12, I could round up a manslaughter instruction in about four or five minutes.
BY THE COURT: Well, I've been sitting here trying to think of whether or not you would be entitled to manslaughter. I'm not convinced that you are. You just  in a murder case a manslaughter instruction is not just automatic. There must be some reasonable grounds for  to give that, and you  I want you to tell me what it is.

(Emphasis added).
BY [DEFENSE ATTORNEY]: But, Judge, just like I said, if 
BY THE COURT: You're talking about if it's a  if it's necessary to use force as self-defense, there must be some lesser force entitles you to a manslaughter instruction.
BY [DEFENSE ATTORNEY]: Right. Let's just say that  uh  the jury says well, he was justified in using his fist to defend himself, but he used a gun to defend himself. I think that would entitle.
BY THE COURT: What are you saying? This is a manslaughter instruction by  in the heat of passion and not in necessary self-defense? Isn't that the instruction, [Defense Attorney]?
BY [DEFENSE ATTORNEY]: No, sir. Judge, I'm just 
BY THE COURT: Isn't that the manslaughter instruction?
BY [DEFENSE ATTORNEY]: Yes, sir.
BY THE COURT: All right. Now listen to the manslaughter instruction. Did kill and  uh  Boyd, in the heat of passion, and not in necessary self-defense.
BY [DEFENSE ATTORNEY]: Or without justification of the law.
BY THE COURT: Can you have [a] manslaughter instruction and also have a defense of self-defense? Manslaughter is an intentional act. If you intentionally kill someone then where is your  how can you claim self-defense?
BY [DEFENSE ATTORNEY]: Judge, every self-defense case is intentional, or the lion's share of them are. I think it just goes to the degree of force.
BY [PROSECUTOR]: Judge, I don't see where a manslaughter instruction is supported by the evidence. I mean, he either  he either was in self-defense or he wasn't. If you use too much force in defending yourself, then you're guilty of murder, not manslaughter. To give a manslaughter instruction he's got to  you know, *850 there's got to be evidence supporting one of the manslaughter statutes  you know, sudden heat of passion, manslaughter by culpable negligence, or whatever the case may be.
BY THE COURT: I've got another question to ask. To be entitled to a manslaughter instruction, when did  when did he become entitled to kill these two persons and be guilty of manslaughter? Because he was there all night and they'd done beat up on him two or three times. What was it, that very moment of killing those two, caused him to in the heat of passion kill? And I say because of the testimony that all night long people would come and go and he never tried to escape. He never asked for them to come to his assistance. He never slipped them a  tried to run out the door when they left. It was a trailer. One door in and out. I'm going to refuse it. Personally, I don't think  you haven't given me an instruction of  uh  definition of manslaughter. Second, I don't think the facts justifies [sic] granting that one.
(Emphasis added). As noted in the quoted passage, the trial judge asked Neese's attorney to give him the factual basis that would support the giving of a manslaughter instruction. While Neese's attorney never directly answered the court, he eventually indicated that Neese was entitled to a heat-of-passion manslaughter instruction. Therefore, we proceed with our analysis on the basis that Neese's claim is that he was entitled to a heat-of-passion manslaughter instruction.[8]
¶ 31. Mississippi Code Annotated section 97-3-35 (Rev.2006) defines heat-of-passion manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense...." The Mississippi Supreme Court has adopted the definition of heat of passion from the fifth edition of Black's Law Dictionary:
In criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Buchanan v. State, 567 So.2d 194, 197 (Miss.1990). The test for determining whether a manslaughter instruction based on a heat-of-passion theory is warranted is "whether the defendant acted in the heat of passion and without malice." Moody v. State, 841 So.2d 1067, 1097(¶ 98) (Miss. 2003). In Moody, the court further held that "the question is an objective one, being whether a reasonable person would have been so provoked." Id. (citing Taylor *851 v. State, 452 So.2d 441, 449 (Miss. 1984)).
¶ 32. There is simply no evidence to indicate that Neese shot Boyd and Peebles while in the heat of passion. In fact, the evidence is consistent with the State's theory that Neese shot Boyd and Peebles while they slept. As noted in his brief to this Court, Neese suggests that the provocation, giving rise to the heat of passion, was the beating that he received at the hands of Boyd and Peebles and the restraint that they imposed on his ability to leave. The problem with this argument is that the shooting did not occur at the time that these acts allegedly took place or in close proximity therewith. We say allegedly because that is Neese's version of what happened. Unfortunately, because of Neese's actions, Boyd and Peebles cannot give their version. However, we note that there is no physical evidence to corroborate Neese's version of the beating. For example, there is no evidence of Neese being bruised in any way, although he testified that Boyd and Peebles threw an arm around his neck, snatched him to the floor, punched him, hit him across the head with a pistol, and kicked him in the side. Surely if a beating of this nature occurred, one would expect to see some bruises on Neese. Also, a heat-of-passion manslaughter instruction cannot be predicated on Neese's testimony that he shot Boyd, the first victim, because he knew Boyd was going for a gun that he claimed was under the couch. Nor can the manslaughter instruction be predicated on Neese's testimony that he shot Peebles because:
[i]mmediately, he  he  he [Peebles] looked over across his shoulder like this and seen  and seen [sic] me, and then he reached  and the gun that was on his shoulder  on his chest, I guess it fell off because he reached and started digging beside  beside the couch and  to get that  to get the gun, and I shot him too.
At that point, Neese was the aggressor because it was he who had set in motion the chain of events by grabbing Boyd's gun. Further, there was no provocation on the part of Boyd. Even if Neese's testimony is to be believed, the events would at most, in the absence of the aggression on the part of Neese, amount to a basis for a self-defense instruction, which was granted. Likewise, there is nothing about Neese's testimony regarding Peebles's actions, even if believed, that suggests any heat-of-passion provocation, or other conduct, on the part of Peebles that placed Neese in peril immediately before Neese grabbed Boyd's gun.
¶ 33. It is well established that a trial judge may properly deny jury instructions when there is no evidentiary basis in the record for them. Terry v. State, 718 So.2d 1115, 1125(¶ 48) (1998) (quoting Dedeaux v. State, 630 So.2d 30, 33 (Miss.1993)). As noted earlier, in his ruling, the trial judge focused on the pivotal time frame, that is, the period of time immediately before the shooting and determined that there was no immediate and reasonable provocation by Boyd and Peebles that would justify a heat-of-passion manslaughter instruction. We agree with the trial judge's ruling that the facts do not warrant a manslaughter instruction.
¶ 34. Although we agree with the trial judge that there was no evidentiary basis for a manslaughter instruction, we should point out another matter that we believe deserves some discussion even though neither of the parties raised it in their briefs. Neese requested, and was granted, the following instruction as D-8:

The Court instructs the jury that the defense in this case is self-defense and that the State is required to prove beyond all reasonable doubt that Paul M. Neese did not act in self-defense in either *852 or both Counts. The State is required to prove further, before you can convict, that Paul M. Neese at the time of difficulty, as a reasonable person, did not have reasonable grounds to apprehend and did not apprehend that he was then and there in danger of great bodily harm, and if the State has failed to prove these facts beyond a reasonable doubt, it is your sworn duty to find Paul M. Neese not guilty in either or both Counts.
(Emphasis added). We note that instruction D-12, the manslaughter instruction sought by Neese, referenced the murder charge, but not the defense of self-defense. The aim of the instruction was to authorize the jury to find Neese guilty of manslaughter if it did not believe that he was guilty of murder. Since Neese had also obtained an instruction that informed the jury that his defense was self-defense, it would seem that the proposed manslaughter instruction had the potential for causing confusion in the jury room. In other words, the granting of the manslaughter instruction had the potential for causing the jury to ignore Neese's stated defense of self-defense. Having said this, we recognize that there are situations where a jury may be properly instructed on both self-defense and manslaughter. However, in those situations, the defense usually argues, without specifically informing the jury by way of instruction what the defense is, that the killing was justified on the basis of self-defense or, in the alternative, was committed in the heat of passion or under other circumstances justifying a finding of manslaughter. See Reed v. State, 526 So.2d 538, 540 (Miss.1988). In this case, instruction D-8 clearly indicates a single defense, not alternative defenses. For all of the reasons discussed, we find no merit to Neese's claim that he should have been granted a manslaughter instruction.
¶ 35. The dissent argues that an evidentiary basis exists for the grant of a manslaughter instruction pursuant to Mississippi Code Annotated section 97-3-31 (Rev.2006). This section provides that "[e]very person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter." With respect to this argument, we make two observations. First, Neese neither requested a manslaughter instruction on this basis during the trial nor hinted that he might be entitled to one on this basis. Second, Neese made it clear during the trial that his sole defense was self-defense. It is true that he also argued that he was entitled to a manslaughter instruction, but as we discuss later, that argument was premised on the erroneous notion that if he used more force than necessary to defend himself, he was guilty of manslaughter, thereby entitling him to a manslaughter instruction. We discuss these arguments in turn.
¶ 36. As we have already shown in the colloquy quoted above, the trial court implored Neese's counsel to advise the court as to the identity of the manslaughter statute that he felt was applicable. Neese's counsel initially failed to do so, but upon further prodding by the court, agreed that the heat-of-passion manslaughter statute would be the applicable statute. Thus, even if a manslaughter instruction were warranted under section 97-3-31, we find that the trial court did not err in refusing to grant it under this section when the specific statute was not brought to the trial judge's attention for consideration. As we have previously noted, "[a] trial judge will not be found in error on a matter not presented to him for decision." Howard v. State, 945 So.2d 326, 360(¶ 71) (Miss.2006) (quoting Smith v. *853 State, 729 So.2d 1191, 1205-06(¶ 63) (Miss. 1998)). Further, it cannot be reasonably argued that Neese was not given an ample opportunity to advise the court as to the type of manslaughter that was implicated by the facts. The trial court literally begged Neese to inform the court of the factual basis for the manslaughter instruction.
¶ 37. It is equally clear from this record that Neese never claimed that he was entitled to a manslaughter instruction, as the dissent now says he was, because a jury could find that he killed Boyd and Peeples while resisting their attempt to hold him hostage. Neese clearly argued that self-defense should be available for the jury's consideration and that he was entitled to a manslaughter instruction because a jury could find that he was entitled to use some force but that he used more force than was necessary. According to Neese, the fact that the jury could so find warranted the giving of a manslaughter instruction. We return to the record to buttress this point:
BY THE COURT: I didn't grant or refuse that [the manslaughter instruction] when I read it the first time. Where's your evidence of manslaughter, [Defense Attorney]?
BY [DEFENSE ATTORNEY]: Judge, I just think that the issue of self-defense is certainly out there. Now, it  it's entirely possible that the jury could say well, he was entitled to exhibit some force, but he used unreasonable force, and I think it's the law in the [S]tate of Mississippi that if you use unreasonable force but are entitled to exhibit some force, then that's manslaughter.

(Emphasis added).
BY THE COURT: It is. You got the law on that?
BY [DEFENSE ATTORNEY]: No, sir.
* * * *
BY THE COURT: You're talking about if it's a  if it's necessary to use force as self-defense, there must be some lesser force entitles you to a manslaughter instruction.
BY [DEFENSE ATTORNEY]: Right. Let's just say that  uh  the jury says well, he was justified in using his fist to defend himself, but he used a gun to defend himself. I think that would entitle.
¶ 38. While Neese argued strenuously that he was entitled to a manslaughter instruction and stated to the trial court that if he was given "four or five minutes" he could produce a manslaughter instruction, he never hinted at the evidentiary basis that would justify the instruction, other than his erroneous notion that if the jury believed that he was entitled to use some force but that he used more force than was necessary, he could be guilty of no crime greater than manslaughter. To suggest, as the dissent does, that Neese was entitled to a manslaughter instruction under section 97-3-31 based on this argument is nonsensical, because under section 97-3-31 a defendant who kills another unnecessarily while propelling an attempt by the other to perpetrate a felony against him is entitled to a manslaughter instruction, no matter the amount of force used. Therefore, on these facts, we find no error on the part of the trial court in not granting Neese additional time to craft an instruction on a basis not permitted by our jurisprudence.
¶ 39. We also find that the trial court was not required to grant sua sponte a manslaughter instruction under section 97-3-31 when Neese was advocating for one based on the erroneous notion that a jury could find him guilty of manslaughter if it determined that he used *854 more force than was necessary. A defendant is entitled to an instruction that supports his theory of the case if there is an evidentiary basis to support it. Chinn v. State, 958 So.2d 1223, 1225(¶ 13) (Miss. 2007) (quoting Phillipson v. State, 943 So.2d 670, 671-72(¶ 6) (Miss.2006)). Our law does not require a trial court to grant sua sponte an instruction on a theory of the case not urged by the defendant, even if there may be an evidentiary basis for the other theory. Such a requirement would be tantamount to mandating that the trial court assist the defendant in the formulation of trial strategy. It is noteworthy that the dissent does not contend that Neese was denied a specific instruction under section 97-3-31 or denied an opportunity to present one based on section 97-3-31. Rather, the dissent contends:
Neese presented two theories in defense of the murder indictment; first, he claimed he acted in necessary self-defense. The jury was properly instructed on this defense. Second, if the jury did not believe he acted in necessary self-defense, then he alternately claimed that he had no malice aforethought but killed unnecessarily. That is, he was guilty of no greater felony than manslaughter.

(Emphasis added). The defense then asserts that "[t]he facts of the case more than support Neese's theory of manslaughter."
¶ 40. We have already discussed Neese's theory of manslaughter, and it is clear to us that Neese's theory of manslaughter, as argued to the trial court, was wholly different from the theory now urged by the dissent. Moreover, Neese does not even urge in his appellate brief the theory that is espoused by the dissent. As stated, the dissent contends that Neese's second theory of defense was that "if the jury did not believe [he] acted in necessary self-defense, then he had no malice aforethought but killed unnecessarily and that he was guilty of no greater felony than manslaughter," thereby entitling him to a manslaughter instruction. This argument is seriously flawed because a finding that Neese did not act in necessary self-defense does not equate to a finding that he acted without malice. Based on the jury's verdict, it is apparent that it believed that Neese acted with malice aforethought and was guilty of murder.
¶ 41. For all of the reasons stated, we find no merit in any of Neese's issues. Therefore, we affirm his convictions and sentences.
¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF NESHOBA COUNTY OF CONVICTION OF TWO COUNTS OF MURDER, AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS FOR EACH COUNT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.
LEE AND MYERS, P.JJ., AND BARNES, J., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, ISHEE AND CARLTON, JJ. CHANDLER, J., NOT PARTICIPATING.
ROBERTS, J., dissenting.
¶ 43. Because a careful review of the record convinces me that Neese was entitled to a properly worded instruction on the lesser-included offense of manslaughter, I must dissent. In my opinion, the trial court erred in refusing Neese's request for a manslaughter instruction. The facts of the case more than support Neese's theory of manslaughter. Furthermore, *855 in this case, the fact that Neese's proffered instruction failed to accurately state the law is not fatal to his claim that the jury should have had the option of a manslaughter verdict. As such, justice requires this Court to reverse Neese's conviction and remand his case for a new trial before a properly instructed jury.
¶ 44. Our standard of review following a refusal of a defendant's requested jury instruction, including a lesser-included-offense instruction, has been stated as follows:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Poole v. State, 826 So.2d 1222, 1230(¶ 27) (Miss.2002) (quoting Smith v. State, 802 So.2d 82, 88(¶ 20) (Miss.2001)). Furthermore, "a lesser-included[-]offense instruction is authorized if a rational or a reasonable jury could find the defendant not guilty of the principal offense in the indictment, but guilty of the lesser-included offense." Poole, 826 So.2d at 1230(¶ 27). Stated differently, "only where the evidence could only justify a conviction of the principal charge should a lesser[-]included[-]offense instruction be refused." Fairchild v. State, 459 So.2d 793, 800 (Miss. 1984). Finally, the supreme court has stated that:
[A] lesser[-]included[-]offense instruction should be granted unless the trial judge  and ultimately this Court  can say, taking the evidence in the light most favorable to the accused and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser[-]included offense (and conversely not guilty of at least one essential element of the principal charge).
Mease v. State, 539 So.2d 1324, 1330 (Miss. 1989) (quoting Harper v. State, 478 So.2d 1017, 1021 (Miss.1985)). However, requested instructions should neither be indiscriminately granted nor granted when based upon pure speculation. Id.
¶ 45. In the case at hand, Neese was charged with two counts of murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev.2006), which states that "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder ... [w]hen done with deliberate design to effect the death of the person killed...." The supreme court has held that the terms deliberate design, malice aforethought, and premeditated design are all synonymous. Hawthorne v. State, 835 So.2d 14, 19(¶ 21) (Miss.2003). It is not my contention that the jury was not entitled to find that Neese possessed the requisite deliberate design to kill Peebles and Boyd needed to find him guilty of murder. I believe that given Neese's testimony, taking the evidence in the light most favorable to Neese, and considering all reasonably favorable inferences which may be drawn from the evidence in favor of Neese, a reasonable jury could certainly conclude that Neese did not have the required malice aforethought (premeditated design, if you will) to kill at the time he shot Peebles and Boyd.
¶ 46. At the conclusion of his trial, Neese submitted defense instruction D-12 to the trial court for consideration. The instruction stated:

*856 The Court instructs the jury that in the event that you do not find the Defendant guilty as charged of murder, but do not believe from the evidence beyond a reasonable doubt, that the Defendant, Paul M. Neese, at the time in difficulty, used more force than was reasonably necessary under the circumstances then and there existing to defend herself [sic], then you may return a verdict finding the Defendant, Paul M. Neese, guilty of manslaughter in either or both counts.
When considering this instruction, the following colloquy transpired:
BY THE COURT: Twelve?
BY THE STATE: Objection
BY THE COURT: What's your objection?
BY THE STATE: Not entitled to a manslaughter instruction.
BY THE COURT: I didn't grant or refuse that when I read it the first time. Where's your evidence of manslaughter, [defense counsel]?
BY THE DEFENSE: Judge, if the  if the court would allow D-12, I could round up a manslaughter instruction in about four or five minutes.
BY THE COURT: Well, I've been sitting here trying to think of whether or not you would be entitled to manslaughter. I'm not convinced that you are. You just  in a murder case a manslaughter instruction is not just automatic. There must be some reasonable grounds for  to give that, and you  I want you to tell me what it is.
BY THE DEFENSE: But, Judge, like I said, if 
BY THE COURT: You're talking about if it's a  if it's necessary to use force as self-defense, there must be some lesser force entitles [sic] you to a manslaughter instruction.
BY THE DEFENSE: Right. Let's just say that  uh  the jury says well, he was justified in using his fist to defend himself, but he used a gun to defend himself. I think that would entitle.
BY THE COURT: What are you saying? This is a manslaughter instruction by  in the heat of passion and not in necessary self-defense? Isn't that the instruction, [defense counsel]?
BY THE DEFENSE: No, sir. Judge, I'm just 
BY THE COURT: Isn't that the manslaughter instruction?
BY THE DEFENSE: Yes, sir.
BY THE COURT: All right. Now listen to the manslaughter instruction. Did kill and  uh  Boyd, in the heat of passion, and not in necessary self-defense.
BY THE DEFENSE: Or without justification of the law.
BY THE COURT: Can you have manslaughter instruction and also have a defense of self-defense? Manslaughter is an intentional act. If you intentionally kill someone then where is your  how can you claim self-defense?
BY THE DEFENSE: Judge, every self-defense case is intentional, or the lion's share of them are. I think it just goes to the degree of force.
BY THE COURT: [State], you got any comment?
BY THE STATE: Judge, I don't see where a manslaughter instruction is supported by the evidence. I mean, he either  he either was in self-defense or he wasn't. If you use too much force in defending yourself, then you are guilty of murder, not manslaughter. To give a manslaughter instruction he's got to  you know, there's got to be evidence supporting one of the manslaughter statutes  *857 you know, sudden heat of passion, manslaughter by culpable negligence, or whatever the case may be.
BY THE COURT: I've got another question to ask. To be entitled to a manslaughter instruction, when did  when did he become entitled to kill these two persons and be guilty of manslaughter? Because he was there all night and they'd done beat up on him two or three times. What was it, that very moment of killing those two, caused him to in the heat of passion kill? And I say that because of the testimony that all night long people would come and go and he never tried to escape. He never asked for help. He never asked for them to come to his assistance. He never slipped them a  tried to run out the door when they left. It was a trailer. One door in and out. I'm going to refuse it. Personally, I don't think  you haven't given me an instruction of  uh  definition of manslaughter. Second, I don't think the facts justifies granting that one.
¶ 47. As is evident from the colloquy above, the trial court refused D-12 based upon (1) a perceived lack of evidence establishing a factual basis for the instruction, and (2) the fact that Neese's proposed instruction did not track any applicable manslaughter statute. However, in the instant case, refusing to allow Neese to present a defense based upon the theory of manslaughter was error under either justification.

1. Refusal of Proposed Instruction D-12 Based Upon a Lack of Factual Support
¶ 48. During his trial, Neese testified in his own defense. He was the only eyewitness to the shooting. He provided the only first-hand information as to the events that led to the deaths of Peebles and Boyd, both of whom were sixteen-year-old teenagers at the time of their deaths. Neese, who was forty-six at the time of the shootings, testified that in his search for an individual identified as Buckwheat, he found himself at a vacant house trailer on Lewis Avenue in Philadelphia, Mississippi at approximately 2:30 or 3:00 p.m. on Monday, November 6, 2006.[9] The three individuals in the trailer in addition to Neese, were Peebles, Boyd, and a third individual identified by Neese as "the tall guy." They assured Neese that Buckwheat would return shortly to the trailer. It is undisputed that Neese was not armed when he accepted Peebles's and Boyd's invitation to enter the trailer. Subsequently, Neese purchased drugs from the tall man and used them in the trailer while he continued to wait for Buckwheat. Neese testified he owed the three guys some money for prior drug purchases. The tall man then asked Neese if he could borrow his car, and Neese agreed. The tall man was gone for an extended period of time, but eventually returned. Throughout the entire time that Neese was in the trailer, there was continuous traffic of drug purchasers coming and going from the trailer. Neese eventually learned that Buckwheat did not have his car; instead, the three drug dealers in the trailer had it. At this point, Neese indicated that he was going to leave, and they told him that he had to pay for the drugs he bought before he left. Neese informed the men that he would pay his debts when they returned his car and that he was leaving. However, when Neese tried to *858 leave, he was attacked, beaten, struck in the head with a pistol, and had his wallet taken. Neese testified that the blow from the pistol almost knocked him unconscious.
¶ 49. He continued to ask the three men if he could leave, but they refused to allow him to leave. After more time passed, Neese told the men that he would go and get the money he owed them if they let him go. At this point, one of the men attacked Neese again and expressed concern that Neese would go to the police if they let him go. Open hostilities subsided, and Peebles and Boyd went on to sell more narcotics. Neese claimed that he wanted to leave, but he was scared. He could see that Peebles and Boyd each had a pistol and one rifle in their possession. As time went on, Peebles and Boyd began to turn customers away and started to smoke marijuana and "chill out" while lying on a mattress and a sofa. What happened next was testified to by Neese as follows:
A. Well, the  well, the guy on  yeah. They got to playing dice and  uh  the guy on the couch, he  he  he laid  he rolled back and laid the gun across his chest, and  and was chilling out, you know? And  uh  the guy on the mattress, he was just sitting there talking with him the whole time. Well  uh  his phone rang, but his phone was laying on the other side of the mattress so he turned over to the phone and  uh  I don't know what, you know. He never did answer it but he was just punching buttons, you know. I didn't know what  you know, but I  I spied the corn  the handle of the gun was sticking out from under him right here because he had done rolled over. (Inaudible) was over there I guess. It was  and I seen the handle of the gun. I told myself that if I could get hold of that gun I could make them let me leave. So that's the only reason I couldn't leave, because they  like I said, they  every time I  you know, talked  every time I had tried, I got trouble out of it.
Q. Did you  did you feel that they would kill you if you ran out the door?
A. Yes, sir. They had done talked about that.
Q. Okay. Well, let me  and let me back up just a little bit. You're  you're disabled aren't you[?]
A. Yes, sir.
Q. Okay. And what's your disability[?]
A. My upper right extremity and lower left extremity are disabled. I don't have full function of my right arm and my lower left leg.
Q. Okay. All right. Have you had problems with your back also?
A. Yes, sir.
Q. So it would be difficult for you to fight  uh?
A. Oh, impossible. I  I've never been able to fight period. I've never  I've never been an aggressive person.
Q. Uh  okay. So, he rolled over and was punching his  his phone?
A. Yeah. He  he rolled over and he  he was facing away from me at that time.
Q. Okay. Then what happened?
A. I seen the butt of that gun and I convinced myself if I could get hold of that gun, I could walk out of there.
Q. Okay. And what did you do then?
A. I reached and grabbed the gun.
Q. Okay.

*859 A. In one motion, I just reached over there and got it. When I went to stand up, I stumbled and fell back and I fell across the front of the chair I was sitting in.
Q. Okay. So you were  were you sitting on the ground, or were you  were you leaning?
A. I was leaning  my arm was into the  sitting in the chair. I left  I fell down in front of the chair.
Q. Okay. What did he do?
A. He looked across his shoulder. He was  like I said, he was laying [sic] on his left side, messing with the phone. He looked across his shoulder and  uh  when he looked across his shoulder he seen [sic] I had the gun. Well, he rolled on over and reached toward the couch. Well I knowed [sic] he was going for a gun, you know. I mean, I ain't stupid.
Q. You  you knew a gun was there?
A. Yes, sir.
Q. Okay.
A. They knew it was there too. They pushed it back up under there with their feet when they was [sic] rolling dice.
Q. What happened then?
A. Well, I  I knew he was going  I knew there was going to be shooting going on, you know. I mean, I just  I didn't really have time to think that much because I knew  I knew he was going  they was [sic] going  I was going to get shot.
Q. So you shot at that one?
A. So I shot him.
Q. Okay. Then what did the other guy do?
A. Immediately, he  he  he looked over across his shoulder like this and seen [sic]  and seen me [sic], and then he reached  and the gun that was on his shoulder  on his chest, I guess it fell off because he reached and started digging beside  beside the couch and  to get  to get the gun, and I shot him too.
Q. Okay.
A. I was certain they was [sic] going to shoot me. There's no doubt about it.
Q. Okay. What  uh  what happened then?
A. The vehicle that was gone  you know, that the tall guy was gone in the vehicle, he pulled back in the yard, and I was afraid he was going to come in and I wasn't going to have a chance to get away. So I reached and grabbed the covers and pulled it over their head [sic] so he wouldn't see everything immediately and it would give me time to get away.
Q. You  you slip [sic] out the door?
A. Eventually, Yes, sir. But when he come in [sic]  when he come [sic] up, I panicked and I  and I kind of run [sic] to the wall over  closer to the door so he wouldn't see me right away, so I could try to bolt and run, but he didn't come in. When he didn't come in, I jumped back over there and found the [phone] the boy was using and tried to dial 911, but I couldn't get it to work. I don't know nothing [sic] about cell phones.
Q. Okay. When you finally did get out, where'd you go?
A. I went and I  I went just straight  you know, I went outside and I  and I found out where the truck was. I found I couldn't go out the driveway to the road so I *860 cut a  I knew about where the jail was so I went straight to the woods and thought I was going straight to the jail, but I come up on [sic] a house first.
The shooting occurred sometime between 5:00 and 6:00 a.m. Tuesday morning. Once Neese arrived at the house he asked the residents to call 911 and summon the police. Law enforcement arrived momentarily. Neese informed the officer that he had just shot two guys in a trailer a few houses up the street on Lewis Avenue. He surrendered the .38 caliber weapon used to the police officer.
¶ 50. Despite the erroneous view of the prosecutor that the use of too much force precludes the defense of manslaughter, the principal element of any of this state's many codified crimes of manslaughter is not the amount of force used, which is irrelevant in most cases of manslaughter, but the absence of legal malice in the commission of a homicide. Mease, 539 So.2d at 1334. Under the standard expounded above, a reasonable juror, if given the opportunity, could quite easily come to the conclusion that Neese acted unnecessarily but without malice aforethought.
¶ 51. The particular manslaughter statute that is most readily implicated by the facts in this case is Mississippi Code Annotated section 97-3-31 (Rev.2006). It states that "[e]very person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter." Miss. Code Ann. § 97-3-31. Additionally, unlike the majority's suggestion that self-defense and manslaughter are mutually exclusive, the theories of unlawful  act manslaughter and self-defense may be alternatively pled with the line of demarcation being whether the jury determines that the killing was unnecessary. See May v. State, 460 So.2d 778, 784-85 (Miss.1984); Robinson v. State, 773 So.2d 943, 951 (¶ 36) (Miss.Ct. App.2000). In fact, Neese presented two theories in defense of the murder indictment; first, he claimed he acted in necessary self-defense. The jury was properly instructed on this defense. Second, if the jury did not believe he acted in necessary self-defense, then he alternately claimed that he had no malice aforethought but killed unnecessarily. That is, he was guilty of no greater felony than manslaughter.
¶ 52. Neese testified that he repeatedly asked to leave the trailer, but Boyd and Peebles refused to allow him to go. On more than one occasion, the pair of drug dealers resorted to violence to prevent Neese's exit. Such a set of facts easily satisfies the elements of kidnapping: a felony. See Miss.Code Ann. § 97-3-53 (Rev.2006). Further, Neese testified that he believed the two drug dealers would kill him if he tried to run out of the trailer, but when he saw his chance to escape, he thought to himself, if I "could get hold of that gun, I could make them let me leave." However, when he took hold of the pistol, he stumbled as a result of his partially disabled leg and fell back. One of the drug dealers reached for a rifle that was under the couch, and before he had time to think about it, Neese shot him. The other drug dealer realized what was happening and began searching for his pistol. Neese shot him as well because he was certain the drug dealer was going to shoot him. The photographs in the record corroborate Neese's version of events and claimed positions of the weapons.
¶ 53. At this point, the tall man returned, and Neese was afraid he would come back inside the trailer before he had time to escape. In an effort to conceal what had happened, Neese covered the *861 bodies of both drug dealers with blankets to make it appear as if they were asleep. This would explain their position when law enforcement arrived. As it turned out, the tall man did not come back inside the trailer, and Neese attempted to call the police on one of the drug dealers's cell phones. However, he was not successful. Neese was eventually able to slip out of the trailer. He believed the local jail was close by and began walking through the woods to reach it. However, he came upon a residential house first and asked the occupant to immediately call the police. Furthermore, law enforcement found the rifle under the edge of the couch, as well as Peeples's pistol stuffed in the couch, just like Neese stated. Dr. Hayne corroborated Neese's testimony about Peeples's and Boyd's drug use when he testified that the toxicological analysis on their urine and blood performed in the autopsy revealed the presence of active and inactive cocaine and marijuana metabolites.
¶ 54. Taking the evidence in the light most favorable to Neese and considering all reasonably favorable inferences that may be drawn in favor of Neese from the evidence, it is without reason to conclude that a jury could find Neese guilty of only murder. Clearly, the jury could easily have believed that Neese was being held hostage against his will by Peeples and Boyd, but that killing them was unnecessary based on all the evidence. Such a belief by the jury would have resulted in a manslaughter verdict. "Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court." Giles v. State, 650 So.2d 846, 849 (Miss.1995) (quoting Hester v. State, 602 So.2d 869, 872 (Miss.1992)).

2. Whether Neese's Inaccurate Manslaughter Instruction Was Fatal
¶ 55. In the instant case, we face an analogous situation to what the supreme court faced in Mease. In that case, the defendant was indicted for capital murder. Mease, 539 So.2d at 1327. At the close of his trial, Mease offered five different jury instructions that would have allowed the jury to find him guilty of manslaughter, none of which accurately tracked any manslaughter statute. Id. The trial court refused each instruction. Id. at 1328. Mease was subsequently found guilty of capital murder and sentenced to death. Id. at 1327.
¶ 56. The supreme court reversed Mease's conviction because he was not allowed to present his factually supported theory of manslaughter to the jury, and the court remanded his case for a new trial. Id. at 1336. The supreme court noted that while Mease's offered instructions seemed to lean toward manslaughter as defined under sections 97-3-31, unlawful-act manslaughter, and 97-3-35, heat-of-passion manslaughter, there was an evidentiary predicate for a manslaughter instruction based upon section 97-3-27, felony manslaughter. Id. at 1335. In that context, the supreme court held that "the trial court has a duty to reform the tendered instruction or advise defense counsel of the perceived deficiencies and afford a reasonable opportunity to prepare another instruction" so long as the proposed instruction related to a central feature of the case and was supported by a legally sufficient evidentiary predicate. Id.
¶ 57. The question of whether a legally sufficient evidentiary predicate was present is answered in the affirmative above. The fact that a manslaughter instruction was central to Neese's case is readily apparent. Manslaughter was one of only two defenses that Neese offered, and manslaughter *862 was not otherwise addressed in the jury instructions. Thus, the trial court had an affirmative duty to either correct Neese's manslaughter instruction so that it accurately stated the law or allow Neese a reasonable opportunity to do the same. The trial court failed to do so, and as a result, the jury was never permitted an opportunity to consider the lesser offense of manslaughter. The only options the jury had were guilty of murder or not guilty. I would reverse and remand for a trial before a properly instructed jury.
GRIFFIS, ISHEE AND CARLTON, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] The record does not reveal Buckwheat's legal name.
[2] The account of what transpired at the trailer, including the killings, as set forth in this opinion is Neese's version, as there were no eyewitnesses to the killings, nor was there any testimony from any of the persons who allegedly visited the trailer during the time Neese was there.
[3] Neese drove his sister's car to the trailer.
[4] Neese testified that he owed Boyd and Peebles money for drugs that he had used during the previous month.
[5] In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court set forth guidelines that law enforcement officials must follow before engaging in custodial interrogation of criminal suspects.
[6] On cross-examination, he testified that, at the time of the shooting, the rifle was under the couch, having been pushed under the couch by Boyd and Peebles while the two were gambling.
[7] Neese offered instruction D-12 which reads:

The Court instructs the jury that in event that you do not find the Defendant guilty as charged of murder, but do believe from the evidence beyond a reasonable doubt, that the Defendant, Paul M. Neese, at the time of difficulty, used more force than was reasonably necessary under the circumstances then and there existing to defend [himself], then you may return a verdict finding the Defendant, Paul M. Neese, guilty of manslaughter in either or both counts.
[8] In his brief, Neese offers only two meager paragraphs in support of his argument that he was entitled to a manslaughter instruction. We quote them in toto:

In the case before the court, Appellant, a man physically unable to defend himself, was kicked and beaten by the two young men he shot. They restrained him when he attempted to leave the premises. These circumstances entitled him to a manslaughter instruction. Grace v. State, 379 So.2d 540 (Miss. 1980); Jones v. State, 773 So.2d 964 (Miss.Ct.App.2000); Ruffin v. State, 444 So.2d 839 (Miss. 1984); Dase v. State, 356 So.2d 1179 (Miss. 1978).
The trial court erred in refusing Appellant's request for a manslaughter instruction (C.P.27). Kolberg v. State, 704 So.2d 1307 (Miss. 1997); Lee v. State, 130 Miss. 852, 94 So. 889 (1922).
[9] The only reasonable conclusion as to the trailer's function is that its sole purpose was to facilitate the buying and selling of controlled substances. In closing argument, defense counsel referred to the trailer as a crack house.