ROBERTS, J.,
 

 for the Court:
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 1. Tracy Smith and Terrance Kuyken-dall were dating at the time of her death. However, Kuykendall was ready to end the relationship, and he expressed this to Tracy. On April 13, 2008, while the couple was at Kuykendall’s grandmother’s house in Marks, Mississippi, they went to a bedroom and began arguing about the situation as Tracy did not want the relationship to end. According to Kuykendall, he went to the restroom down the hall. While there, he heard a gunshot. Upon returning to the bedroom, he saw that Tracy had been shot. The gun that was used, which Kuykendall testified that Tracy was holding when he went to the restroom, was never found.
 

 ¶ 2. While allegedly on his way to the police station to turn himself in, Kuyken-dall was arrested. He was subsequently indicted on the charge of murder. Kuyk-endall’s trial took place on September 15-17, 2009, in the Circuit Court of Quitman County. The jury found him guilty, and he was sentenced to life. Kuykendall now appeals his conviction and raises the following issues:
 

 I. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT’S MOTIONS FOR A MENTAL EXAMINATION; and
 

 II. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT A DIRECTED VERDICT BASED UPON THE
 
 WEATHERSBY
 
 RULE.
 

 Finding no error, we affirm.
 

 DISCUSSION
 

 I. MOTIONS FOR A MENTAL EXAMINATION
 

 ¶ 3. Kuykendall argues that the trial court erred in denying his motions for a mental examination as Kuykendall’s and other witnesses’ testimonies established a valid basis for granting the request. Rule 9.06 of the Uniform Rules of Circuit and County Court states, in pertinent part, that “[i]f before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination.... ” “[T]he standard for competence to stand trial is whether the defendant has ‘sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding’ and has ‘a rational as well as factual understanding of the proceedings against him.’ ”
 
 Dunn v. State,
 
 693 So.2d 1333, 1340 (Miss.1997) (quoting
 
 Godinez v. Moran,
 
 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). The
 
 *378
 
 Mississippi Supreme Court has further held that a defendant who is competent to stand trial is one:
 

 (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.
 

 Martin v. State,
 
 871 So.2d 693, 697 (¶ 17) (Miss.2004). Finally, the standard of our review is such that:
 

 When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial — the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial' inquiry, the trial judge must weigh the evidence and be the trier of the facts.
 

 Id.
 
 at 698 (quoting
 
 Emanuel v. State,
 
 412 So.2d 1187, 1189 (Miss.1982)).
 

 ¶ 4. Prior to Kuykendall’s first trial for the murder of Tracy, which ended in a mistrial, his court-appointed attorney requested a mental evaluation, but it was denied. Similarly, Kuykendall’s court-appointed attorney for his second trial for the murder charge filed a motion requesting that Kuykendall receive a mental evaluation to determine whether he could stand trial. Approximately three weeks before Kuykendall’s trial began, a pretrial hearing was held on the motion to determine his ability to stand trial.
 

 ¶ 5. At the hearing, Kuykendall’s attorney stated that after meeting with Kuyk-endall in private, he felt that Kuykendall was not competent to stand trial or have an understanding of what was happening. Specifically, the defense attorney stated that Kuykendall felt “that everybody was plotting against him,” stated that he heard voices, and expressed during his last hearing that Johnny Cochran was representing him. The trial court then asked Kuyken-dall several questions. Kuykendall stated that he felt as if he was just as equal as any other man in the courtroom. In response to the trial court’s question of whether there was a need for an examination, Kuykendall stated: “No, none whatsoever.”
 

 ¶ 6. Shirley Kuykendall, Kuykendall’s mother, then testified as to her son’s mental state. She stated that Kuykendall was a bright, intelligent, and nice kid who did not have any mental problems. Further, she testified that Kuykendall finished high school and one year of college. She also clarified that Kuykendall was referring to the Johnny Cochran Firm, rather than the man himself. This stands in contrast to Kuykendall’s aunt’s statement during his sentencing hearing that he had “lost touch with reality long ago.”
 

 ¶ 7. The trial court further questioned Kuykendall. The trial court asked when and where he was born, which Kuykendall answered. Additionally, the trial court asked when and where he had finished high school. Kuykendall appropriately answered, and he added that he graduated high school with a 3.5-grade-point average. Furthermore, the trial court asked Kuykendall if he understood the charge he faced and the consequences of being found guilty or not guilty. Kuykendall explained that he was charged with murder and
 
 *379
 
 would face substantial jail time if found guilty. He further understood that he would be set free if found not guilty. Additionally, Kuykendall stated that he felt he had the ability to confer with his attorney to discuss trial strategy and other pertinent matters as to his defense. Finally, Kuykendall stated that: “I understand everything. I understand [sic] it the first time I got trial [sic].”
 

 ¶ 8. The trial court then questioned two law-enforcement officers who had been able to observe Kuykendall during his pretrial incarceration. They both testified that they did not observe any actions by Kuykendall that indicated any mental imbalance. Based upon the testimony that was presented, the trial court found that:
 

 Kuykendall has a rational understanding of the charge against him, that he does have a present ability to confer with his attorney.... So he’s well abreast of the severity of the case.... And that [Kuykendall] is in a position to confer with his attorney and to advise, to assist him in devising whatever trial strategy is necessary to defend him during the course of the trial.
 

 Therefore, the trial court found that Kuyk-endall was mentally competent to stand trial.
 

 ¶ 9. At the conclusion of the second day at trial, Kuykendall’s attorney moved the trial court to reconsider its determination that Kuykendall was competent to stand trial. This motion was based upon the testimony of Terrance Paul Smith (Smith), Tracy’s cousin. Smith’s pertinent testimony on this matter included claims that Kuykendall told him that an “Arab kingpin [had] offered him so many kilos that — but the only way that he can [sic] get those and get in they [sic] game was if he killed Tracy.” Additionally, Smith stated that Kuykendall told him that he was having dreams involving Tracy’s mother and father telling him that Tracy had started the house fire that killed them.
 

 ¶ 10. Kuykendall also argues that his testimony during his direct examination should have required the trial court to sua sponte reconsider its earlier denials of his motions. Specifically, during his explanation of why he and Tracy temporarily moved to Texas, Kuykendall stated:
 

 When we was on Elm Street, or whatever, you know, we had got — someone had been tryin’ to kill us, you know, when we was at her house on Elm Street, or whatever.
 

 It started off where, you know, somebody had started puttin’ poison, or whatever, you know, in our food, or whatever, you know, and we had went to the hospital, or whatever.
 

 [[Image here]]
 

 So the next situation was that somebody had tampered with the gas heater, or whatever, when we was at the house, or whatever.
 

 ¶ 11. Upon our review of the record, we find that the trial court’s holding is not against the overwhelming weight of the evidence. It is clear from the trial court’s examination of Kuykendall that he understood the severity of the consequences with which he was faced. Additionally, there is no evidence that Kuykendall was unable to adequately assist in his defense. In fact, he took the stand and testified in his own defense. Therefore, we find this issue without merit.
 

 II. THE
 
 WEATHERSBY
 
 RULE
 

 ¶ 12. Kuykendall argues that the
 
 Weathersby
 
 rule applies and that the trial court erred in denying his motion for a directed verdict because he was the only eyewitness to the killing, and his version of events was not substantially contradicted in material particulars.
 
 See Weathersby v.
 
 
 *380
 

 State,
 
 165 Miss. 207, 147 So. 481 (1933). Specifically, in
 
 Weathersby,
 
 the supreme court held that:
 

 where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [SJtate, or by the physical facts or by the facts of common knowledge.
 

 Id.
 
 at 209, 147 So. at 482.
 

 ¶ 13. As we noted in
 
 Neese v. State,
 
 993 So.2d 837, 843 (¶ 12) (Miss.Ct.App.2008), a failure to specifically argue the
 
 Weathers-by
 
 rule before the trial court as a ground for a directed verdict constitutes a procedural bar to appellate review of that specific issue. However, procedural bar notwithstanding, we find that the
 
 Weathersby
 
 rule is inapplicable to the facts of this case.
 

 ¶ 14. Kuykendall testified that he and Tracy were in a bedroom of his grandmother’s house arguing about their relationship. Kuykendall further stated that Tracy had tried to harm herself in the past and had his pistol in her hand. According to Kuykendall, at some point, he left the bedroom and went to the bathroom. He stated that he was in the bathroom for approximately fifteen minutes before he heard a gunshot. After verifying that his grandmother and aunt, who were also in the house, were unharmed, he went back to the bedroom and saw that Tracy had been shot. Therefore, by his own testimony, Kuykendall was not an eyewitness to the killing. Because he was not an eyewitness to the killing, the
 
 Weathersby
 
 rule does not apply.
 
 See Lynch v. State,
 
 877 So.2d 1254, 1280 (¶ 83) (Miss.2004);
 
 Kidd v. State,
 
 258 So.2d 423, 429 (Miss.1972).
 

 ¶ 15. Further, the
 
 Weathersby
 
 rule is only applicable when the defendant’s version of the event is not “substantially contradicted by material particulars .... or by the physical facts or facts in common knowledge.”
 
 Weathersby,
 
 165 Miss. at 209, 147 So. at 482. The evidence presented does substantially contradict Kuykendall’s version of the events making the
 
 Weathersby
 
 rule inapplicable.
 

 ¶ 16. The bullet fragments analyzed during Tracy’s autopsy were consistent with bullets fired from a Hi-Point weapon. Kuykendall owned a 9-millimeter Hi-Point gun which was neither recovered at the crime scene nor recovered since. Kuyken-dall’s explanation that he heard footsteps after the gunshot is not a reasonable explanation that someone came into the home and took the gun. Further inconsistent with his version of the event is the lack of gunshot residue on Tracy’s hands and the location of the bullet entry on the left side of the Tracy’s head. These are both inconsistent with a close contact, self-inflicted gunshot wound by a right-handed victim. Kuykendall’s previous death threats against Tracy, coupled with his statements of “I killed her” to both his best friend and later to the police, are also inconsistent with his version that Tracy had committed suicide.
 

 ¶ 17. Because Kuykendall was not an actual eyewitness to the event and his version of the event is substantially contradicted by the evidence, the
 
 Weathersby
 
 rule does not apply. As such, this issue is without merit.
 

 ¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF QUITMAN COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO QUIT-MAN COUNTY.
 

 
 *381
 
 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ, CONCUR.