# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00683-COA

**ROBERT FLOYD MCGUIRE A/K/A ROBERT MCGUIRE**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/06/2012 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER AND SENTENCED TO LIFE IMPRISONMENT |
| DISPOSITION: | AFFIRMED - 10/14/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ISHEE, ROBERTS AND JAMES, JJ.**

**ROBERTS, J., FOR THE COURT:**

¶1.     Following trial in the Rankin County Circuit Court, a jury convicted Robert Floyd McGuire of the murder of Lynda Tate. McGuire, unsuccessful in his post-trial motions, filed the present appeal challenging the circuit court's admission of certain evidence, the denial of his peremptory instruction, and the denial of his motion for a new trial. Finding no error, we affirm McGuire's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the evening of December 3, 2011, John Santistevan was at his home in Rankin County when McGuire, his next-door neighbor, knocked on his door. McGuire asked Santistevan to call 911 because he had just shot his girlfriend, Lynda Tate, at their home.[1] When emergency officials arrived, they discovered Tate, deceased in a chair in her living room, with a gunshot wound to her head.

¶3.     At trial, McGuire admitted he had been drinking alcohol that day, that Tate had to pick him up earlier, so he could avoid getting a DUI, and that Tate wanted him to quit drinking. He explained that after they arrived home, he went to account for his guns after having concerns he had left one in their recreational vehicle. He found the .45-caliber Hi Point pistol in their bedside-table drawer, and he took it out of the holster because he thought about cleaning it. Still holding the pistol, McGuire leaned in to give Tate a kiss on the cheek/ear lobe. He stated that the hand holding the pistol was placed on the back of the chair. McGuire said Tate swatted at him with her hand, as if to shoo him away, and the gun then inexplicably discharged. McGuire testified that he loved Tate and never intended to shoot her.

¶4.     According to Lisa Funte, a medical examiner for the State of Mississippi, Tate died of a gunshot wound to the left side of her head. The entry wound was slightly above Tate's left ear, with a back-to-front and upward trajectory. Funte also explained that the gunshot came from close range, meaning approximately an inch or closer, and Tate's middle finger

---

[1] The 911 audio tape was admitted into evidence over McGuire's objection that it contained hearsay. This evidence will be discussed in greater detail in the first issue of this opinion.

was wounded by the gunshot. Mississippi Crime Lab forensic scientist Felecia Robinson testified that the projectiles recovered from the scene came from the pistol that was also recovered from the scene. She also explained that this pistol had a manual safety on the side above the magazine well; a magazine safety, meaning the pistol would not discharge unless the magazine was fully seated inside the magazine well; and an internal safety that would require the trigger to be pulled with a pressure greater than 7.25 pounds of force. According to Robinson, the pistol did not have a hair trigger and would not accidentally discharge if it was dropped. The State also presented evidence that McGuire tested positive for gunshot residue on both hands.

¶5. On March 8, 2012, McGuire was indicted, pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014), for the murder of Tate. McGuire's trial was held on September 24-26, 2012, and resulted in a jury convicting him of murder. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. McGuire filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which the circuit court denied. McGuire filed the present appeal and raised the following three issues, which we quote:

I. Whether the trial court erred in admitting impermissible evidence of other bad acts under hearsay exceptions when the evidence was highly inflammatory, purely speculative, without relevance, and manifestly not admissible[.]

II. Whether the trial court erred in refusing to grant [McGuire's] peremptory instruction where [McGuire] was the only witness to the death of his girlfriend and where his version of the events was born[e] out of the evidence and was not substantially contradicted in any material particulars[.]

3

III.     Whether the trial court erred in failing to grant McGuire a new trial where the jury's verdict was not supported by the weight of the evidence[.]

## ANALYSIS

### I.     911 RECORDING

¶6.    McGuire argues that the circuit court erred in the admission of a portion of the 911 call. An appellate court applies an abuse-of-discretion standard when reviewing a circuit court's admission or exclusion of evidence. *Anderson v. State*, 62 So. 3d 972, 933 (¶13) (Miss. 2011) (citation omitted).

¶7.    The State called Santistevan, and he testified:

Q.    Where did you live on December 3, 2011?

A.    The address is . . . .

Q.    Okay. And tell the ladies and gentlemen of the jury what happened to you that afternoon.

A.    Well, I was doing laundry and some other stuff, taking care of stuff. I heard the doorbell ring and I answered the door and Mr. McGuire had stated that he had just killed his girlfriend and I needed to call 911. And before he was really finished, he started walking away so I just closed the door. I didn't really think anything of it other than maybe he was having a fight. And I thought about going over there and seeing what I could do and then I thought maybe I better not and I called 911 right away, 911.

Q.    And what did you report to 911?

A.    I told them that the neighbor had came over and said that he had just murdered his girlfriend that I should call 911.

McGuire made no objection to Santistevan's testimony.

¶8.    The State then called Kim Preston, the communications supervisor for the Brandon

Police Department. Preston was asked a number of questions to lay a foundation to offer the 911 recording. She testified:

Q.    When a 911 call comes into the Brandon Police Department, is it the regular practice of the police department to make a recording, an audio recording of that call?

A.    Yes, sir.

Q.    And is that audio recording normally kept and maintained by the Brandon Police Department?

A.    Yes, sir.

Q.    Now if someone was going to get a copy of a 911 call from the Brandon Police Department, who would they come to to get a copy?

A.    They would come to me.

Q.    Ms. Preston, I'm going to hand you a disk. Can you tell me what that is[?]

A.    That is the 911 recording in this case.

. . . .

Q.    [T]his disk that you made, does it contain an actual call, actual recording of the 911 call that came in to the Brandon Police Department involving the Robert McGuire case?

A.    Yes, sir.

Q.    And whenever you make this recording, do you in any way change or alter the contents of that phone call?

A.    No, sir.

Q.    Is that phone call on the recording exactly as it was made that night?

A.    Yes, sir.

State:    Your Honor, we'd ask that this disk, this audio disk be entered

into evidence as the State's next number.

Court:      What says the Defense?

Defense:    Your Honor, we'd object. There may be hearsay statements on that recording.

Court:      Counsel, approach.

(On-the-record bench conference.)

Court:      What do you mean it may be?

Defense:    Well, I mean, there's calls that came in from --

Court:      Have you not heard the 911 call?

Defense:    I have, and there are hearsay statements if that is the same one I'm listening to. And what I'm saying is, there's calls coming in –

Court:      What hearsay statements?

Defense:    That's what I was gone [sic] say. Hearsay in the sense of calls coming in from persons who called into the police department.

State:      This audio recording is one phone call made by the prior witness, John Santistevan, to the Brandon Police Department.

. . . .

State:      Present sense impressure. [sic]

Court:      Well, you're making a 911 call that he . . . made immediately after being told [by McGuire,] the neighbor[,] that he had killed his girlfriend. Is this the only thing that's on there?

State:      That's the only thing that's on it, your Honor. It's either an excited utterance --

Court:      Do you dispute that?

. . . .

6

Defense:     I don't -- and y'all . . . can correct me if I'm wrong [but] . . . I
             don't recall having a single disk with that only on it.

State:       It was included in the disk and you had everything --

Defense:     Well, I --

. . . .

Defense:     -- it's included.

Court:       Okay.

(End of bench conference.)

Court:       George, I'm going to ask you to show the jury to the jury room,
             please, sir.   (Jurors exit courtroom.)

             Okay.  Mr. Boykin, state your objection.

Defense      My objection is, your Honor, that, first of all, I was provided a
             number of DVDs, . . . which include audio recordings[,]
             presumably of   police communications concerning this
             incident[,] beginning with someone calling to Brandon PO and
             then going on for what seemed like two hours of just nothing but
             communications between various officers and officers in
             dispatch and dispatch and AMR and also with the fire
             department.

             Now, at no time was I ever provided a single DVD that only
             contained -- well, let me back up.  I don't know what the DVD
             contains.  They're asking it to be included in evidence.  I was
             under the[,] I guess[,] mistaken impression that we were talking
             about a DVD that had all police communications.  Now I'm
             hearing that this DVD is[,] . . . they've taken one segment of it
             and made a new DVD, and I understand[,] and I'm not just
             saying they're misleading me, but I understand that on this new
             DVD that there's only a single call.

             Now if I understand either [of the prosecutors] right, it is the
             initial 911 call.

             Now, I contend that call into the police, . . . while it may be kept

7

in records, this includes hearsay statements made[,] and I don't even know who made them. . . . I don't even know what's on the DVD other than what has been . . . [,]now after the fact[,] represented to me by the prosecution.

Court:      All right. The question is: Were you given in Discovery a recording of the 911 call?

Defense:    I was given in Discovery a DVD that included a call, yes, sir.

Court:      Of the witness that just got through testifying?

Defense:    Yes, sir.

. . . .

Court:      I've heard your objection now. I'm going to let the State respond.

State:      Your Honor, [McGuire] was given a disk including this. The disk that the State is wanting to put into evidence at this time only contains the 911 call that was made to the Brandon Police Department from the prior witness, Mr. John Santistevan.

            Case law, *Cabrer[e] [v]. Mississippi*, 920 So. 2d 1062 [(Miss. Ct. App. 2006)], clearly indicates that in this particular case a radio log was admissible as a business record exception of the hearsay rule[.]

            Also the Mississippi Supreme Court held that a transcript of the 911 call fell under the present sense impression to the hearsay rule, as well to the excited utterance exception to the hearsay rule.

Court:      I understood that it was being admitted or offered into evidence pursuant to those exceptions. I understand that. But the question is, . . . does this tape only include the 911 call?

State:      It is solely that 911 call. Nothing else.

Court:      And the substance of that 911 call was provided in Discovery to [McGuire] even though it was on a disk that had other things as well?

State:        That is correct.

Court:        All right. Mr. Boykin, I'll hear any response from you.

Defense:      Well, . . . I don't believe it's considered a present sense impression, . . . . I think it falls outside of that exception and I think there was one other exception [the prosecutor] mentioned. I don't recall what it was. But I contend that . . . in this case[,] it was not a present sense exception nor any other exception of the hearsay rule. . . .

. . . .

Court:        I'm going to overrule your objection to that extent . . . that it is a business record. It is admissible for that reason.

Number [two,] . . . [i]t is an excited utterance according to what the witness just testified to, what he heard[,] and when he made the call; and,

Number [three,] . . . [t]hat it would be a present sense impression.

Plus, I assume that, what we're fixing to hear on here, is the same thing that the witness just testified to, to which you did not object. So the objection, as it relates to this tape as to being hearsay, is overruled.

Any other objection?

Defense:      No, sir. No.

Court:        All right. Now, I'm admitting it provisionally with the fact that it's nothing other than the 911 call on the tape.

State:        Your Honor, it's about a minute and [fifty] seconds if you'd like for me to play it for the Court before the jury comes in.

Court:        And if y'all have listened to it and y'all -- I've got no reason to dispute that. I just don't want it to be anything else other than the 911 call.

State:        It's solely the 911 call.

9

¶9.    McGuire objected to the introduction of the 911 recording on the grounds of hearsay. M.R.E. 801-802.    The circuit court overruled the objection and found there were several applicable exceptions to the hearsay rule. The circuit court noted that the business-record exception in Mississippi Rule of Evidence 803(6), the present-sense impression exception in Mississippi Rule of Evidence 803(1), and the excited-utterance exception in Mississippi Rule of Evidence 803(2) applied.  The circuit court then asked McGuire if he had "[a]ny other objection," to which McGuire replied, "No, Sir, No."  Then, the recording was played for the jury.

¶10.   The following is a transcript of the 911 call offered in evidence:

Operator:    Brandon 911.  Where is your emergency?

Caller:    Yea.  My neighbor just came over to tell me – I'm at . . . , and he's like right next door . . . , he says that he just killed his girlfriend, but I'm not going over there.  It seems  to be like . . . he's drunk as well.

Operator:    Does he say how he did it?

Caller:    No.  He just knocked on my door and told me that and walked away.  I didn't hear any shooting or anything.  He's . . . probably been beating her up.

Operator:    Okay. . . . [D]o you know any motivation why he would say something like that?

Caller:    No, I just keep away from these people over here.

Operator:    Okay, we're gonna have some officers come out and check it out.

¶11.   Shortly thereafter, the jury was excused.  McGuire then moved for a mistrial.  He argued that he "would be highly prejudiced" by Santistevan's statement in the 911 call that

10

"he's probably been beating her up."  McGuire further argued that "it would only be natural for the jury to believe . . . the neighbor knew something or may have known something allegedly about McGuire having previously beaten this woman[,] which is totally untrue."  The circuit court overruled the motion for a mistrial and reasoned:

> Prior to playing the 911 tape, there was a [hearsay] objection, we dealt with the objection.  [McGuire] had the tape[,] and you did not object or did [not] raise any objection [other than the hearsay objection] prior to the playing of the tape.  You [(McGuire)] . . . would have been aware of what was on the tape of the 911 call.  In my opinion, if you had objected to the statement about the beating you should have objected to that prior to the time it was played to the jury, so I think your objection was not timely.  But for all the other reasons I previously said, a mistrial was denied, but I believe you should have raised that objection before it was played.

¶12.   In the appeal before this Court, McGuire does not challenge the circuit court's finding that the 911 recording was admissible as an exception to the hearsay rule as a business record, a present-sense impression, or an excited utterance.  Thus, we do not address whether the circuit court properly ruled on the admissibility of the 911 recording as an exception to the hearsay rule.

¶13.   Instead, in this appeal, McGuire argues that the circuit court erred because Santistevan's statement in the 911 recording – "he's probably been beating her up" – was not relevant under Mississippi Rule of Evidence 402 or should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice" under Mississippi Rule of Evidence 403.

¶14.   In *Sumner v. State*, 316 So. 2d 926, 927 (Miss. 1975), the supreme court held:

> The rule governing the time of objection to evidence is that it must be made as soon as it appears that the evidence is objectionable, or as soon as it could reasonably have been known to the objecting party, unless some special reason

11

makes a postponement desirable for him which is not unfair to the proponent of the evidence.

"An objection must be made with specificity, and failure to articulate the grounds for objection constitutes a waiver of the alleged error." *Ross v. State,* 954 So. 2d 968, 987 (¶27) (Miss. 2007). "Furthermore, when a party makes an objection on specific grounds, it is considered a waiver regarding all other grounds." *Copeland v. Copeland*, 904 So. 2d 1066, 1073 (¶24) (Miss. 2004) (citing *Burns v. State*, 729 So. 2d 203, 219 (¶67) (Miss. 1998)).

¶15.    McGuire made a timely and contemporaneous objection as to hearsay, yet he failed to object to the relevance or the unfair prejudicial nature of the statement until after it was played for the jury. Because McGuire failed to timely and specifically object, we find no merit in this issue.

## II.    SUFFICIENCY OF THE EVIDENCE

¶16.    Next, McGuire submits that, pursuant to *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933), the circuit court erred in failing to grant his motion for a directed verdict and his peremptory instruction. "*Weathersby*, of course, is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law." *Jackson v. State*, 551 So. 2d 132, 136 (Miss. 1989). Because *Weathersby* is a determination of whether a defendant is entitled to a motion for a directed verdict, it is viewed as a challenge to the sufficiency of the evidence. *See Watts v. State*, 717 So. 2d 314, 320 (¶16) (Miss. 1998) ("Watts'[s] assignment of error [that the circuit court erred in denying his motion for directed verdict based on the *Weathersby* rule] essentially amounts to a challenge to the sufficiency

12

of the evidence presented by the State."). Our standard of review is outlined as follows:

> This Court reviews a challenge to the sufficiency of the evidence in the light most favorable to the State, giving the State the benefit of all favorable inferences reasonably drawn from the evidence. If the facts and inferences considered point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, this Court must reverse and render.

*Id.*

¶17.  According to *Weathersby*, 165 Miss. at 209, 147 So. at 482:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge.

McGuire asserts that he was the sole eyewitness, that his version of the events that the shooting was accidental was reasonable, and that his version of the events was not contradicted in material particulars or by the physicals facts. We disagree.

¶18.  We first note that "a failure to specifically argue the *Weathersby* rule before the trial court as a ground for a directed verdict constitutes a procedural bar to the appellate review of that specific issue." *Kuykendall v. State*, 50 So. 3d 376, 380 (¶13) (Miss. Ct. App. 2010) (citing *Neese v. State*, 993 So. 2d 837, 843 (¶12) (Miss. Ct. App. 2008)). McGuire moved for a directed verdict and later renewed the motion; however, he never argued that the motion should be granted based on *Weathersby*. This issue is also procedurally barred.

¶19.  Procedural bar notwithstanding, we find *Weathersby* to be inapplicable. McGuire's version of the events is contradicted by the physical facts. First, McGuire testified that he placed the  pistol on the back of the chair Tate was sitting in when he leaned in to kiss her.

13

McGuire's story of what happened next varied. He told Investigator Beau Edgington in a video statement that he was not touching the pistol when it discharged. He later stated that he dropped the pistol, although he explained at trial that he did not mean that he dropped it on the floor but onto the back of the chair. Forensic scientist Felicia Robinson testified at trial that there were three safety measures on that pistol so that it could not be accidentally discharged. With the manual safety on the outside of the pistol off and the magazine seated inside the magazine well, the pistol still would not discharge when dropped absent a pressure greater than 7.25 pounds pulling the trigger. Robinson demonstrated this by dropping the unloaded pistol; the hammer did not fall. Using weights, Robinson also demonstrated how much force on the trigger would be required to discharge the pistol. Funte, a medical examiner for the State of Mississippi, testified that the trajectory of the bullet, based on the entry and exit wounds, was slightly upward from back to front, entering slightly above the left ear and exiting her skull from the right side. The locations of Tate's injuries, as described by Funte, are inconsistent with McGuire's testimony that the pistol went off from the back of the chair, as the back of the chair was higher than Tate's head.

> In those cases in which the defendant is the only eyewitness to the slaying, and in which the *Weathersby* rule is inapplicable (i.e., the defendant does not secure a directed verdict of acquittal), it then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit.

*Blanks v. State*, 547 So. 2d 29, 33-34 (Miss. 1989). Since *Weathersby* is inapplicable because McGuire's version of the events is contradicted by physical evidence, it was for the jury to determine McGuire's credibility, and it did so by returning a guilty verdict. Viewing the evidence in the light most favorable to the State, we determine that there was sufficient

14

evidence to support the jury's verdict.

¶20.   This issue is without merit.

### III.   WEIGHT OF THE EVIDENCE

¶21.   Lastly, McGuire challenges the circuit court's denial of his motion for a new trial, submitting that the jury's verdict was not supported by the weight of the evidence.   On appeal, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).

¶22.   McGuire argues his testimony that he did not intend to kill Tate was uncontradicted and that there was "not enough evidence before the jury for the jury to conclude that . . . deliberate design existed."   However, McGuire also admitted at trial that Tate did not like his drinking, particularly on the weekends. He admitted that he had been drinking earlier that day and that Tate had to pick him up so he would not get a DUI.   He also admitted that Tate was giving him the silent treatment after they returned home.   In the 911 recording, Santistevan told the operator that McGuire appeared to be drunk when he knocked on the door.   A reasonable juror could infer that Tate and McGuire were at odds, specifically on that day, over his drinking.   This information, coupled with the physical evidence that contradicts an accidental discharge of the pistol, would support the jury's verdict of murder over manslaughter.   We do not find that the verdict of murder was so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction an unconscionable injustice.

¶23.    This issue is without merit.

¶24.    **THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.**

    **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND JAMES, JJ., CONCUR.  MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**