# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00935-COA

**CLARK ALLEN A/K/A CLARK ALLEN, JR.**              **APPELLANT**
**A/K/A CLARK EARL ALLEN, JR.**

**v.**

**STATE OF MISSISSIPPI**                           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/10/2022 |
| TRIAL JUDGE: | HON. LEE SORRELS COLEMAN |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Clark Allen appeals his conviction for one count of capital murder after a Lowndes County Circuit Court jury found him guilty of shooting and killing three men in one act, scheme, course of conduct, or criminal episode.[1] Allen was sentenced to life imprisonment

---

[1] Mississippi Code Annotated section 97-3-19(2)(i) (Supp. 2017) states:

The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

. . . .

Murder of three (3) or more persons who are killed incident to one (1) act,

without eligibility for parole. Allen argues one issue on appeal: whether the trial court erred in refusing to instruct the jury on his alternative defense theory of heat-of-passion manslaughter. Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. On January 15, 2019, Ronald Cunningham went to Demario "Mario" Snell's trailer in Artesia, Mississippi where he met Snell, Maricio Nance, Tyshun Fields, and Clark Allen to play video games and smoke marijuana. At around 3:15 p.m., Cunningham left to go pick up his sister. Cunningham later returned to the trailer. As he approached, however, he saw people from neighboring trailers running around and looking in the windows of Snell's trailer. The neighbors told him that they had heard five or six gunshots from the trailer. They then saw a man with dreads dressed in all black come outside, put a gun in his pocket, and run through the bushes. Based on the description, Cunningham believed the person to be Allen (a.k.a. "Big Man").

¶3. Cunningham then entered the trailer to find Fields' dead body in the living room. In the backyard, Cunningham saw Nance's dead body. Cunningham then contacted the authorities.

¶4. Meanwhile, Lowndes County Constable Sonny Sanders had heard about the shooting. As he was proceeding to the trailer park, he heard on his scanner that Floyd McKee, a conductor at the Kansas City Southern Railroad, had spotted someone suspicious walking the railroad tracks who discarded an object in a ditch. As Sanders drove past Beullah Grove

scheme, course of conduct or criminal episode[.]

2

Church on his way to investigate, he saw Allen emerge from behind a train car and walk toward the church. Sanders detained Allen and the authorities arrived minutes later. McKee was brought to the church, where he confirmed that Allen was the person he had seen near the tracks earlier. Days later, officers searched the tracks and found a handgun in the area where McKee had described Allen dropping something. Allen was taken into custody.

¶5. After a lengthy investigation, including examinations by ballistics and forensics experts, medical examiners, and interviews with Allen, Allen was indicted for capital murder under Mississippi Code Annotated section 97-3-19(2)(i). Trial commenced on June 7, 2022. Below is the trial testimony that is relevant on appeal.

*Ronald Cunningham*

¶6. The State called Cunningham as its first witness. Cunningham described Artesia as a close-knit community of family and friends, with almost everybody being related or knowing each other in some way. Cunningham testified regarding the events leading up to the shooting as described above.

¶7. Cunningham described the layout of the trailer and confirmed the accuracy of a diagram produced by the State[2] of the room where the shooting took place. He said that prior to his leaving to pick up his sister, there was no "friction" between any of the men. He also stated that none of the men had treated Allen in a negative or hostile way while he was there. Cunningham confirmed that he was gone from the trailer for roughly fifty minutes and that

---

[2] Investigator Clint Sims was an investigator with the Lowndes County Sheriff's Department at the time of the shooting. He conducted a review of the crime scene a few days after the shooting in order to craft a diagram of the trailer's floor plan.

3

he did not know if anybody else had arrived at the trailer during that time, either before or after the shooting. Cunningham stated that he saw neither Snell, Nance, nor Fields with a gun when he was with them prior to the shooting.

*Sergeant Adam Honsinger*

¶8.　Honsinger, a corporal with the Lowndes County Sheriff's Department, arrived at Snell's trailer after receiving word of a shooting in the area. As he approached the trailer, the front door was open and he saw a woman come out of the trailer who then ran across the yard. Honsinger did not get the woman's name, and he never saw the woman again. Honsinger then entered the trailer, where he found Fields' dead body in the living room, next to a cinder block, and Snell's dead body in the hallway near the backdoor. Honsinger stated he did not observe any weapons near or on either of the bodies. While on the scene, Honsinger heard a different woman crying and saying "he's dead" from the backyard. When he approached the woman, he saw Nance's dead body and removed the woman from the area. Honsinger confirmed he did not find any weapon near Nance's body either. Honsinger did not search either of the two women but said he did not see any weapons on them, and he would have noticed if they did.

*Officer Scott Glasgow*

¶9.　Glasgow, an investigator with the Lowndes County Sheriff's Department, arrived at Beulah Grove Church after Constable Sanders detained Allen. At trial, Glasgow testified that he performed a gunshot residue (GSR) test on Allen at the church. Glasgow explained that a GSR kit detects whether a suspect has recently fired a firearm by detecting gunpowder

on the skin or clothing of the suspect. Glasgow tested both of Allen's hands. Glasgow then turned over the GSR kit to investigator Darrell Nabors.[3]

¶10.    Glasgow then went to 23 Mobile Drive to assist with the investigation of the crime scene. There, Glasgow helped remove the deceaseds' bodies and collected cell phones and other evidence. Glasgow also assisted the Mississippi Crime Lab investigators with casting a footprint outside of the trailer, which he identified as a match to the shoes that Allen was wearing when he was arrested. Glasgow was present days later when the firearm was found in a small ditch filled with water in the woods next to the railroad, near where Allen was spotted by McKee.

*Investigator Greg Nester*

¶11.    Nester was a crime scene investigator with the Mississippi Bureau of Investigation at the time of the shooting. Nester took photographs and wrote notes describing the scene. Referring to these notes, Nester said that Nance was found lying face down on the ground in the backyard, clutching a purple lighter in his left hand. Nester also identified Snell's body in the hallway by the back door face down on the floor. Nester found Fields' body in the living room on his back with his head propped up against the couch and a cinderblock adjacent to his backside. Nester said that it almost appeared as if Fields was sitting on the cinderblock prior to falling prone on his back. There was also a video game controller

---

[3] Jacob Burchfield was employed by the Mississippi Forensics Laboratory as a forensic scientist. Burchfield testified at trial and confirmed the results of the GSR kit administered by Glasgow. The results showed gunpowder particles present on the back and palm of Allen's right hand. Burchfield confirmed that this was indicative of somebody who had been in close proximity to a discharged firearm.

adjacent to Fields' left arm and a television remote adjacent to Fields' left foot. Nester said he did not see any weapons near any of the victims' bodies.

¶12. Nester also described a bullet casing in the living room near the hallway leading toward the back door. Another casing was found on one of the couches between the cushion and the armrest, and a third casing between the couches. Nester testified that all of the casings were for a .40-caliber handgun.[4] There were also bloodstains along the western and eastern walls of the living room as well as on the floor as one entered the living room from the hallway. Nester said that he saw no sign of a struggle, such as broken chairs, couches that had been thrown over, or broken dishes.

*Medical Examiner Dr. Mark LeVaughn*

¶13. LeVaughn worked as a board-certified forensic pathologist with the Mississippi Medical Examiner's Office. LeVaughn examined the bodies of Snell, Fields, and Nance. LeVaughn described the wounds on the bodies all to have been "distant wounds" meaning the firearm was discharged further than three feet away from the victim.

¶14. Snell had an entry wound from a gunshot on the left side of his back. Based on x-rays, the bullet traveled from left to right, passing through Snell's left lung, heart, and right lungs before coming to rest on the right side of the chest. The cause of death was ruled to be a gunshot wound to the back, with the manner of death being homicide.

¶15. The entry wound on Fields was on the upper-left thigh. The bullet exited the left thigh

---

[4] Investigator Sims also later testified that, while conducting his review of the scene for the diagram, he discovered another bullet casing on the headrest of the couch between the creases of the cushion. The bullet was collected and sealed. It was identified as another .40-caliber round for a handgun.

6

and re-entered the right thigh where bullet fragments were found. Fields also had a second gunshot wound to the back, entering on the left and traveling to the right, injuring and hemorrhaging the right lung. The cause of death was ruled to be a gunshot wound to the back, with the manner of death being homicide.

¶16. LeVaughn also testified about the examination report for Nance; however, the actual examination was conducted by another examiner who left the examiner's office. The bullet that killed Nance entered his upper-left arm, exited, and then entered his upper-left chest. Upon entering the chest, the bullet traveled from left to right, injuring both the left and right lungs. The bullet traveled horizontally and came to rest in the right chest cavity. The cause of death was ruled to be a gunshot wound to the chest, with the manner of death being homicide.

*Tommy Bishop*

¶17. Bishop worked for the Mississippi Crime Laboratory. He was qualified to testify as an expert in firearms and ballistics. Bishop confirmed that all of the casings found at the scene were for a .40-caliber handgun. He also confirmed that the handgun found in the ditch by the railroad was a Glock model 23 .40-caliber pistol. He also confirmed that the four projectiles recovered from the bodies of the victims were all .40-caliber rounds.

*Investigator Tony Cooper*

¶18. Cooper was a deputy with the Lowndes County Sheriff's Office at the time of the shooting. He testified about an instant message, a video, and internet searches that he recovered from Allen's cell phone. The State introduced, through Cooper's testimony, a

7

message Allen sent to a friend two days before the shooting: "let me borrow that strap for a day or two when you get back." Cooper testified that a "strap" is slang for a gun, normally a handgun. Also recovered from the phone was a video, recorded roughly one day before the shooting, of Allen holding what appeared to be a tan Glock pistol that matched the description of the Glock (a model 23 .40-caliber) recovered in the ditch. The phone also contained Allen's recent search history. One search inquiry read: "can you fit a 9mm bullet in a .40 cal," which Allen entered at around 4:00 p.m. on the day before the shooting. Another search was for "[h]ow to keep the safety on a Glock" made at 9:30 p.m. the day before the shooting. The last search read: "can a .45 bullet fit in a .40" made at around 12:00 p.m. on January 15, the day of the shooting.

*Captain Darrell Nabors*

¶19. Nabors, a captain with the Lowndes County Sheriff's Department on the day of the shooting, was the lead officer in charge of the investigation. Nabors interviewed Allen after he was taken into custody. Nabors recalled no evidence of injuries to Allen that indicated he had been in a fight, and said that Allen did not request medical attention.[5]

¶20. Prior to the interview, Nabors read Allen his *Miranda*[6] rights, and Allen voluntarily agreed to give a statement. The video recording of the statement was played for the jury. In the recording, upon being told he was going to be asked questions regarding the shooting,

---

[5] The State presented photos of Allen's left arm, which appeared to show thin scratches across the forearm. Nabors said that these injuries appeared consistent with somebody walking through the woods.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

Allen said he didn't know anything about the shooting. Allen said he went to Artesia around 1:00 p.m. and he asked Snell to "front" him some marijuana, but Snell said no. He then stopped at a friend named Jason's house, but Jason was not home. Allen returned to Snell's house, and Snell was smoking marijuana with some friends. While there, Allen smoked with Snell and some other people. Then, he said he left and took a different route by the train tracks to avoid walking through the mud. When asked if he heard any gunshots, he said he did not, but he also said he was high from smoking and that could explain why he didn't remember. Later, he said he heard sirens and somebody "hollering and crying" down the railroad tracks.

¶21. In the video, Allen denied ever having a gun, saying he could not afford a gun even if he wanted one. When asked if he wanted to admit to being at the trailer at the time of the shooting, Allen maintained his claims that he was not at the trailer at the time of the shooting. Overall, the State emphasized that, throughout the video recording, Allen denied having any knowledge or involvement in the shooting ten times in total.

¶22. The State then introduced Allen's jailhouse phone call recordings and the transcripts of the calls. Nabor testified that, despite Allen's outright denial of any knowledge of the shooting, in the phone calls Allen said that the men in the trailer were trying to kill him. Allen did not mention any of the men in the trailer having weapons. Instead, in one call, he said that the men tried to take his gun. But in another phone call to his mother, Allen denied involvement in the shooting.[7]

---

[7] On cross-examination, Nabors also confirmed that the jailhouse phone calls were recorded almost a year after Allen gave this second recorded statement.

¶23. The State questioned Nabors about the layout of the living room, referring to the diagram that Investigator Sims had produced and Cunningham's testimony of where Allen, Snell, Nance, and Fields were sitting. Nabors confirmed that each gunshot wound sustained by the victims corresponded with the orientation of where Allen was sitting and where the victims were sitting.

¶24. On cross-examination of Nabors, Allen attempted to introduce a recording of a second interview Allen gave to Detective Brent Swan with the Lowndes County Sheriff's Department.[8] The court denied the introduction of the complete video because Nabors was not the officer who conducted the interview.[9] However, the court did allow portions to be played for impeachment purposes only.

¶25. In those portions, Allen said that he was going to tell the police the truth about the shooting. Allen stated in that recording that he was acting in self-defense, that the men "jumped" him and tried to take his gun. Allen also said he did not originally admit to shooting the men because he was high, was scared of retribution, and did not want his mother to know.

_____

[8] Despite attempts by defense counsel to have Detective Swan testify, he was "unavailable for process" due to him being on vacation at the time of the trial.

[9] The best summation of what was contained in the video recording of Allen's confession was in this statement during a bench conference:

> [State]: The reality is, it was – because the video shows Clark Allen initially says – he doesn't claim he was beat up. He claims there was a tussle for the gun; that he thought the guy was gonna shoot him, so he got – he took the gun and shot him. He thought the other two were gonna go get guns, so he shot them in the back, right? That's what he says. Then he actually says, oh, I'm just joking. That was a joke. I was just joking.

10

¶26. Allen then introduced photographs taken by Swan during the second interview wherein Allen alleged he was injured from the "tussle" over the gun. Counsel for Allen pointed out some discoloration under Allen's eye, to which Nabors agreed that "[f]rom the lighting maybe, maybe a little discoloration there." Nabors also confirmed that in Allen's statement to Swan, Allen alleged he was punched in the face.

¶27. The State then rested. Allen made a motion for a directed verdict, which was denied. Allen then testified in his own defense.

*Clark Allen Jr.*

¶28. Allen testified that he went to Artesia on the day of the shooting to hang out with friends and family that he knew in the area. Allen knew Snell and had previously gone to Snell's trailer to buy marijuana and hang out. On the day in question, Allen went to Snell's to buy marijuana and play video games. When he arrived, Allen saw Jason Lucius, who entered the trailer with him. Jason bought some marijuana from Snell, and Allen asked Snell to "credit him a blunt." Snell refused, so Allen left with Jason.

¶29. Allen then spoke with Jason, who said to meet him at his house where they would smoke. Allen said he went through a path in the woods and arrived at Jason's, but Jason was not home yet. At this point, Allen tried to get a ride to his dad's house in Macon, but couldn't, so he returned to Snell's trailer at around 1:00 p.m. When he arrived at the trailer, Snell was smoking and offered it to Allen. While smoking and hanging out, Nance came to the trailer. Nance began to smoke and sat on the other couch next to Allen. Between 2:00 and 3:00 p.m., Fields arrived at the trailer and started to play video games with the other men.

Shortly after Fields arrived, Cunningham came to the trailer but did not stay long. At this point, it was roughly 3:15 p.m., and Allen, Snell, Nance, Fields, and Cunningham were at the trailer. Cunningham bought some marijuana from Snell and then left.

¶30. Allen said after Cunningham had left, Allen was on FaceTime until his phone died. After charging his phone on the other side of the room, he stood up to retrieve it and Nance saw the handgun hanging out of Allen's hoodie pocket. Nance asked to see the gun, and Allen told him no. Nance pressed him to see the gun, but Allen refused and told Nance that the matter was over. At this point, Allen and Nance began wrestling for the gun, and Allen claimed he saw Snell pull a gun, saying:

> [Allen]: So we end up wrestling over the gun. Like, we end up wrestling, you know. He end up punching me in the face, so then I seen Mario Snell pull [a] gun, I just started shooting.
>
> Q: So tell me, prior to the punch or right after the punch, what were you doing? You were just sitting there minding your own business?
>
> A: Yes, sir.
>
> Q: Wasn't nothing out of the play?
>
> A: No, wasn't nothing.
>
> Q: So you didn't – so when he punched you in the face, what did it feel like?
>
> A: I felt – you know, I really felt disrespected, but then, you know, I felt like I was in danger.
>
> Q: And why did you feel like you were in danger?
>
> A: Because I had seen a gun.

Allen went on to say that he had seen Snell with a "[s]mall, black gun" before. After seeing

the gun, Allen said he started shooting.

¶31.    After shooting, he ran out the front door of the trailer. Allen said he was afraid for his life because the other men had family in the area. Based on this fear, Allen ran through the woods and wound up on the railroad tracks. Allen said he dropped his hoodie and jacket because he did not want anybody to recognize him, out of fear that "[t]he people's family" would "try to kill me." While walking on the tracks, Allen got a call from his mother, who told him that she heard that three people in Artesia had been shot and killed, that people saw Allen running, and that the police were looking for him. Allen then got a call from his dad, who told him to meet him at the church because he was coming to get Allen. Allen then went to the church, and that is where Constable Sanders arrested him.

¶32.    Allen said when he was being questioned by Nabors, he was worried for his family's safety because he was afraid that the victims' families would take their anger out on his family. When asked why he denied any involvement with the shooting when Nabors asked him about it, he said he was trying to distance himself from the shooting to protect his family. However, after being processed he knew he was being charged with the murders. The next day, after staying in the jailhouse, Allen said he spoke with Detective Swan. At first, Allen continued to deny everything. However, when asked to tell the truth, Allen finally relented and told Swan that he started shooting to defend himself because he was scared.

¶33.    The State then cross-examined Allen. When asked whether he caused the gunshot wounds to the victims, Allen denied knowing any details about what wounds were caused by his gunshots, because he had his eyes closed or "[s]omething like that." Allen also could

13

not explain how Nance sustained a distant gunshot wound through the left arm while they were wrestling. Allen did, however, definitively state that he started shooting, not because of the wrestling, but because he had seen Snell pull out a gun. However, while Allen said he told Detective Swan that Snell had a gun, the portion of the video recording played for purposes of impeachment did not reflect that.

¶34. At the end of cross-examination, the State asked Allen one last time:

Q: Listen, man, tell the truth. You executed these three boys.

A: No, sir. I did not execute them. It was self-defense.

¶35. On redirect, Allen's counsel asked if he recalled telling Swan that he saw one of the victims with a gun. In order to refresh his memory, defense counsel attempted to play the recording of the second interview, as a prior consistent statement. However, the State objected, arguing that in the interview Allen only said, "I thought they had guns," rather than, "I thought I saw a gun." Ultimately, the court allowed Allen to testify regarding what he remembered saying to Swan without playing the full recording of the second interview. Ultimately Allen said, "I'm saying I thought them other boys had guns."

*Jury Instructions Conference*

¶36. During the jury instruction conference, Allen requested a self-defense instruction as well as alternative imperfect self-defense and heat-of-passion manslaughter instructions. The self-defense and imperfect self-defense instructions were granted. However, the heat-of-passion manslaughter instruction was denied. While the transcript shows some confusion regarding the labeling of instructions, it appears that the court denied the heat-of-passion

14

manslaughter instruction because it found there was no evidence in the record upon which a reasonable jury could have found Allen guilty of manslaughter based on heat of passion rather than murder.

*Jury Verdict and Post-Trial Motions*

¶37. The jury deliberated and found Allen guilty of capital murder for the killing of Tyshun Fields, Mauricio Nance, and Demario Snell. Allen filed a motion for JNOV or a new trial. In the motion, Allen raised as error the court's denial of the heat-of-passion manslaughter instruction. The court denied the motion for JNOV or a new trial. Allen appealed.

¶38. On appeal, Allen raises the single issue that the court erred in refusing to give his heat-of-passion manslaughter instruction.

**DISCUSSION**

¶39. "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). However, our Supreme Court has held that "we review a trial judge's denial of a lesser-included-offense jury instruction de novo." *Anderson v. State*, 361 So. 3d 609, 614 (¶13) (Miss. 2023). Further, "[i]t is well settled that 'manslaughter is a lesser-included offense of murder.'" *Id*. (quoting *Shumpert v. State*, 935 So. 2d 962, 968 (¶16) (Miss. 2006)). Thus, we review the trial court's refusal of Allen's heat-of-passion manslaughter lesser-included-offense instruction de novo.

¶40. "In homicide cases, the trial court should instruct the jury about a defendant's theories

15

of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely[,]" *Nelson*, 248 at 718 (¶26), and "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *Brown v. State*, 39 So. 3d 890, 899 (¶34) (Miss. 2010). "This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, *or is without foundation in the evidence*." *Westbrook v. State*, 29 So. 3d 828, 835 (¶25) (Miss. Ct. App. 2009) (emphasis added) (quoting *Wallace v. State*, 10 So. 3d 913, 916 (¶9) (Miss. 2009)). Before the trial court is "obligated to instruct the jury on [a defendant's theory]," the defendant must "offer some evidence to support [it]." *Nelson*, 284 So. 3d at 718 (¶26). Moreover, "[a] defendant has a right to a lesser-included-offense instruction if there is some evidence from which a reasonable juror could find him *both* not guilty of the indicted offense *and* guilty of the lesser-included offense." *Wallace v. State*, 369 So. 3d 83, 87 (¶13) (Miss. Ct. App. 2023) (quoting *Curtis v. State*, 298 So. 3d 446, 451 (¶11) (Miss. Ct. App. 2020) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013))). "[I]f no reasonable jury could have found the defendant guilty of the lesser-included offense, we will uphold the denial of the proposed instruction." *Anderson*, 361 So. 3d at 614 (¶13) (quoting *Gilmore*, 119 So. 3d at 286 (¶13)).

¶41. Mississippi Code Annotated section 97-3-35 (Rev. 2014) provides that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." The Mississippi Supreme Court has defined heat of

16

passion as

> a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Abeyta v. State*, 137 So. 3d 305, 310 (¶10) (Miss. 2014) (quoting *Batiste v. State*, 121 So. 3d 808, 844 (¶70) (Miss. 2013)). However, "[t]hat the accused subjectively experienced passion and anger is not enough to reduce a killing to manslaughter." *Id*. "Rather, the impassioned reaction of the accused must have been reasonable." *Id*. "[T]he passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Id*. (quoting *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001)). Heat of passion is a state of mind marked by passion overthrowing reason. *Id*.

¶42. In *Neese v. State*, this Court considered a case where the defendant shot and killed two men after they had allegedly beaten him for not paying them the money he owed them. *Neese v. State*, 993 So. 2d 837, 840-41 (¶¶3-6) (Miss. Ct. App. 2008). In that case, Neese arrived at the trailer of Buckwheat to collect a vehicle that he had given Buckwheat as collateral for a loan that Buckwheat extended to Neese. *Id*. at 840 (¶3). However, Buckwheat was not home. *Id*. at (¶4). Instead, Boyd and Peebles were at the trailer. *Id*. The two men told Neese that Buckwheat would be home soon, and invited Neese inside. *Id*. There, Neese purchased cocaine from another individual, smoked it in the trailer, and later attempted to leave. *Id*. at (¶5). However, according to Neese, Boyd and Peebles would not

17

let him leave because he had not paid back the money he owed Buckwheat. *Id*. Neese said

he would pay them back once he received the car he had given Buckwheat. *Id*. The two men

then accosted Neese, causing him to stay. *Id*. Later, early in the morning, Neese took a gun

off of Boyd and shot him while he was sleeping. *Id*. at (¶32). Neese claims that after

shooting Boyd, Peebles awoke and went to grab another gun. *Id*. Out of fear that he was

going to be shot, Neese then shot Peebles. *Id*. At trial, the court allowed Neese's self-

defense instruction with respect to Peebles but not a heat-of-passion manslaughter

instruction. *Id*.

¶43. On appeal, Neese argued that the trial court's refusal to grant a heat-of-passion

manslaughter instruction as to the second victim was error. *Id*. This Court found that

"[e]ven if Neese's testimony is to be believed, the events would at most . . . amount to a basis

for a self-defense instruction, which was granted." *Id*. Based on these facts, we held that the

trial court did not err in refusing the heat-of-passion manslaughter instruction, because even

when taking the evidence in the light most favorable to Neese (i.e., believing his

uncorroborated testimony), it still only necessitated a self-defense instruction and not a heat-

of-passion manslaughter instruction. *Id*.

¶44. We find the *Neese* analysis is applicable here. Allen specifically testified as to why

he started shooting:

> Q: All right. Now you said – I'm going to use the Defense's exhibit. You said
> that this wrestling and tussling was what caused you to use the gun, right?
>
> A: No. I seen the gun. That's what caused me to start shooting.
>
> . . . .

Q: I want you to describe to the jury the injuries on your face that made it necessary for you to kill three people.

A: Man, I had a little swole, you know what I'm saying, but I got hit in the face, though.

Q: Okay. So you got hit in the face, you're a little swole and that's what you said caused you to shoot and kill three people.

A: I ain't say that. I did not say that.

Q: All right. It was the gun.

A: Yeah. I seen a gun. He pulled a gun. I was in fear for my life.

In this exchange Allen clearly admitted that he did *not* start shooting out of heat of passion provoked by being struck in the face. Rather, he claims he only shot out of fear for his life after allegedly seeing Snell's gun. Under *Neese*, evidence that the defendant was in fear for his life only necessitated a self-defense instruction, not a heat-of-passion instruction.

¶45.    In addition, no reasonable jury could have found Allen *both* not guilty of murder *and* guilty of heat-of-passion manslaughter rather than murder. There were no precursor events demonstrating any animosity among the men or ill will. Cunningham testified that when he was there, everyone was getting along. The record does not reflect that Allen was in a state of violent or uncontrollable rage at the time of the shooting. There was no physical evidence in the room of a struggle among the parties, and if there had been, Allen suffered only a minor discoloration on his forehead. No other gun was found at the scene that might have corroborated Allen's claim that he saw Snell with a gun. All victims were shot from a distance, one body being found by the back door, another body in the living room, and a third body outside in the yard. Two of them were shot in the back, indicating they were fleeing

19

from Allen when he killed them. Most significantly, Allen specifically *said* he shot in self-defense, not because he had been hit by Nance or otherwise provoked, which precluded a manslaughter instruction. Additionally, the deliberate design needed for a murder conviction "may be formed quickly, even moments before the act and may be inferred from the use of a deadly weapon." *Anderson*, 361 So. 3d at 617 (¶24) (quoting *Sands v. State*, 62 So. 3d 374, 378-79 (¶24) (Miss. 2011)). The trial court did not err by refusing Allen's heat-of-passion manslaughter instruction.

¶46.    While a scenario may exist where a defendant could have multiple reasons for killing a victim, thus being entitled to both a self-defense instruction and a heat-of-passion instruction,[10] this is not such a scenario. Because Allen explicitly stated that his motivation for shooting the victims was fear that Snell might shoot him, there was no evidence supporting giving the lesser-included-offense instruction of heat-of-passion manslaughter. However, Allen was entitled to both self-defense and imperfect self-defense instructions because his testimony provided sufficient evidence to support such an instruction.

**CONCLUSION**

¶47.    While our Court is required to view the evidence in the light most favorable to the defendant, *Anderson*, 361 So. 3d at 614 (¶¶13-14), after considering the evidence presented by the State and Allen's explicit testimony regarding his motivation for killing the men, we find that there was no evidence upon which a reasonable jury could have found Allen guilty of heat-of-passion manslaughter and not guilty of murder. For this reason, we find that the

---

[10] *See generally Buchanan v. State*, 567 So. 2d 194 (Miss. 1990).

20

trial court did not err in refusing to give the heat-of-passion manslaughter instruction.

¶48. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**